**FEDERAL TRADE COMMISSION,**
**Petitioner,**

v.

**LANCASTER COLONY CORP., INC. and**
**Federal Paper Board Co., Inc.,**
**Respondents.**

**No. 77 Civ. 3004 (LFM).**

United States District Court,
S. D. New York.

July 21, 1977.

Michael N. Sohn, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, Jerold D. Cummins, Acting Asst. Gen. Counsel, Warren S. Grimes and Jared O. Blum, Attys., F. T. C., Washington, D. C., for petitioner; Peter E. Greene, Brian H. Siegel, Edward S. Atkinson, Attys., Bureau of Competition, F. T. C., Washington, D. C., Myer S. Tulkoff, F. T. C., New York City, of counsel.

Ralph W. Brenner, Howard D. Scher, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Grant S. Lewis, LeBoeuf, Lamb, Leiby & MacRae, New York City, for respondent Lancaster Colony Corp., Inc.; Richard R. Murphey, Jr., Fred A. Summer, Dunbar, Kienzle & Murphey, Columbus, Ohio, of counsel.

White & Case, New York City, for respondent Federal Paper Board Co., Inc.; Edward Wolfe, James B. Rather, John Lewis, New York City, of counsel.

MacMAHON, District Judge.

This is a motion by the Federal Trade Commission ("FTC"), under Section 13(b) of the Federal Trade Commission Act (15 U.S.C. § 53(b) (Supp. IV, 1977)), for a preliminary injunction enjoining the acquisition by respondent, Lancaster Colony Corp., Inc. ("Lancaster"), of the assets of the Federal Glass Company Division of respondent, Federal Paper Board Co., Inc. ("Federal"), pending determination of administrative proceedings commenced by the FTC challenging the lawfulness of the acquisition under the antitrust laws (Section 7 of the Clayton Act (15 U.S.C. § 18)) and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

## THE STATUTORY STANDARD

The governing statute, Section 13(b), provides, in pertinent part:

"(b) Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . ."

■ The statute is relatively new and has not yet received much judicial attention. Moreover, the public interest standard laid down for injunctive relief, though long applied by administrative agencies, is novel and raises policy issues which courts are ill equipped to resolve.[1] It seems clear, however, from the language and legislative history of Section 13(b) that the central issue for us is not whether respondents have violated, or are about to violate, the antitrust laws, for adjudication of those issues is vested in the FTC in the first instance. *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976). Rather, the question for us is whether the FTC has shown prima facie that the public interest requires that a preliminary injunction issue to preserve the status quo until the FTC can perform its adjudicatory function. *FTC v. Food Town Stores, Inc., supra*, 539 F.2d at 1342.

■ According to the statute, in determining whether an injunction is in the public interest, we must weigh both the "equities" and the "likelihood" that the FTC will ultimately prevail on the merits of its antitrust claims. The legislative history of Section 13(b), however, reveals that:

"The intent is to maintain the statutory or 'public interest' standard which is now applicable, and *not* to impose the traditional 'equity' standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and need for injunctive relief." H.R.Rep.No.624, 93d Cong., 1st Sess. 31 (1971) ("Conference Report") (emphasis in original).

Thus, while the statute requires us to consider the FTC's likelihood of ultimate success and to exercise our independent judgment in that regard,[2] it appears that it does not require the FTC to prove, or us to find, probable success on the merits but something less. We think the FTC meets its burden on the "likelihood of success" issue if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits. In short, if it shows that the newly-minted

**1.** *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963).

**2.** The Conference Report continues:
"The inclusion of this new language is to define the duty of the courts to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction. This new language is intended to codify the decisional law of *Federal Trade Commission v. National Health Aids*, D.C., 108 F.Supp. 340 and *Federal Trade Commission v.*

*Sterling Drugs, Inc.*, 2 Cir., 317 F.2d 669, and similar cases which have defined the judicial role to include the exercise of such independent judgment. The Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard which the common law applies to private litigants." H.R.Rep. No.624, *supra*, at 116. See *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808–09 n. 5 (2d Cir. 1975).

"equities" weigh in its favor, a preliminary injunction should issue if the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals. Cf. *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953), enjoining a merger under the Clayton Act.

Accordingly, we see no need for an evidentiary hearing nor for extensive analysis of the underlying antitrust issues. In *Hamilton Watch Co., supra,* our Court of Appeals characterized such an approach as thoroughly sound where an evidentiary hearing would have had to examine the economic characteristics of a substantial industry and the injunction merely preserved the status quo. *SEC v. Frank,* 388 F.2d 486, 491 (2d Cir. 1968).

Surely, we are not required, on a Section 13(b) application, to examine the economic characteristics of the entire glassware industry or to try the case. As a practical matter, a district court can hardly do more at so early a stage of antitrust litigation than to make a considered estimate of the FTC's apparent chances of success based upon what must necessarily be an imperfect, incomplete and fragile factual basis. Similar estimates are made on equally insecure footings on most motions for a preliminary injunction in antitrust cases. This is particularly true when the challenge to the acquisition is grounded on Section 7 of the Clayton Act, where the ultimate question is whether the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the country.

As the Supreme Court noted in *United States v. Philadelphia Nat'l Bank supra,* 374 U.S. at 362, 83 S.Ct. at 1741, 10 L.Ed.2d 915, these are not the kind of questions which are "susceptible of a ready and precise answer." They require "not merely an appraisal of the immediate impact of the [acquisition] upon competition, but a prediction of its impact upon competitive conditions in the future . . .. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive."

Obviously, a "firm understanding" of the setting and unique facts of a given market cannot be made without a plenary trial. It, therefore, seems clear that Congress intended that on applications under Section 13(b), the district court be guided by preliminary and tentative findings of fact without attempting to resolve the underlying antitrust issues of fact. Imperfections are inherent in the problem. We must work within the limitations of the allotted time imposed by the need for speedy action due to the imminence of the challenged transaction and the burdens of this congested court. Cf. *SEC v. Frank, supra,* 388 F.2d at 490 et seq.

The structure of the relevant market and the competitive effect of a given acquisition vary with the setting and unique facts of each case. *Brown Shoe Co. v. United States,* 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). We turn, then, to consideration of the FTC's likelihood of success based on the facts and setting shown in the evidence and exhibits submitted by the parties.

## LIKELIHOOD OF SUCCESS

### A. *The Setting*

On March 4, 1977, Lancaster announced that it had agreed to acquire the assets of Federal Glass Company Division. The closing was scheduled for April 25, 1977, but on June 7, 1977 the FTC issued its administrative complaint charging that the acquisition would violate Clayton § 7 and § 5 of the Federal Trade Commission Act. At the re-

quest of the FTC's staff, Lancaster agreed to postpone the transaction until June 24, 1977 and later until July 5, 1977. This application followed, and the motion was adjourned until July 7, 1977, at the request of the parties under an agreement not to consummate the transaction pending argument. Following argument, we issued a temporary restraining order pending determination of the motion for a preliminary injunction.

### B. *Line of Commerce*

The primary problem in ascertaining market structure under the Clayton Act is definition of the product (relevant product or services market) and "section of the country" (relevant geographic market) in which to appraise the actual or probable competitive effect of the acquisition. *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 618, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Philadelphia Nat'l Bank, supra; Brown Shoe Co. v. United States, supra.*

The parties agree that the entire nation constitutes the relevant geographic market, but there is a sharp dispute as to what constitutes the relevant product market.

The "boundaries" of a market "may be determined by examining such practical indicia as industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Brown Shoe Co. v. United States, supra,* 370 U.S. at 325, 82 S.Ct. at 1524.

The FTC asserts that respondents are major competitors and that the acquisition will result in Lancaster's acquiring an undue share of the market and in undue concentration, in violation of Clayton § 7. The FTC defines the product market as moderately-priced (less than $1.00) machine-pressed and machine-blown soda-lime glassware collectively.

Respondents assert that they are not competitors, that the acquisition will not result in Lancaster's acquiring an undue share of the market or undue concentration, that the FTC's market definition is artificial, and that the machine-pressed and machine-blown soda-lime glassware are sufficiently distinct to constitute different lines of commerce and that, if they are to be regarded as a single line, the line should be broadened to include higher priced borosilicate glassware, such as pyrex, as well as plastic beverage and tableware, china and earthenware, paper cups and styrofoam, and metal and other products.

Lancaster and Federal, through subsidiaries or divisions,[3] manufacture and sell broad lines of glassware items intended for everyday use. Both manufacture and sell the four major product classifications recognized by the industry trade association, the American Glassware Association ("AGA"), specifically, beverageware, tableware, food preparation ware and ornamental and novelty glassware. All of Federal's, and substantially all of Lancaster's, glassware are machine-made, and the average unit wholesale price in the industry is less than $1.00. The glassware is sold in interstate commerce to mass merchandisers, hotels, restaurants, distributors, jobbers, specialty accounts, such as florists, and premium accounts, such as supermarkets and fast food chains. Each company has its own sales force and uses manufacturers' representatives. The glassware is generally displayed in the same section of retail stores, has unique use characteristics and is perceived by customers as different from other lines.

---

**3.** We will disregard details concerning divisions and subsidiaries in order to avoid needless obfuscation of the essential facts.

Lancaster also distributes its product through "a party plan organization" under which hostesses arrange informal parties for selling Tiara glassware items. Most of Lancaster's glassware is manufactured in Dunkirk, Indiana, and all of Federal's is manufactured in Columbus, Ohio. Lancaster also imports and sells glassware.

Both companies produce and sell soda-lime machine-made glassware, which is Lancaster's only product and Federal's primary product. This is low or moderately-priced glassware and is manufactured by heating a mixture of sand and other raw materials until the mixture becomes molten. The molten glass is then fed into a mold on a forming machine, which either presses or blows the molten glass into the desired form. Machine-blown glass is made by injecting air into the mold, thereby forcing the molten glass to the extremes of the mold. Machine-pressed glass is made by forcing a mechanized plunger into the mold, thereby pushing the molten glass into the area between the walls of the mold and the plunger.

The Lynch Press is the standard machine used for making pressed glassware, while the Hartford 28 is the standard machine used for making blown glassware. Most manufacturers operate both types of forming machines and supply them with molten glass from the same furnace. The machines operate differently, at different speeds; their operators are trained differently; and their product differs in some respects from blown glass. Each process is capable of producing a variety of glassware items. Generally, blown glassware is lighter in weight, has a thinner wall, and is produced at a slightly faster rate than pressed glassware but does not have the same capacity for variety.

Lancaster produces primarily ornamental and decorative glassware almost exclusive-

ly, and Federal produces both machine-pressed and blown glassware with about three-fourths of its total sales consisting of blown tumblers.

Both machine-pressed and machine-blown glassware are recognized as one industry. Although pressed glassware is somewhat heavier and has a slightly different appearance, many items can be made through either process. They serve the same general uses, are produced in the same factories, and require the same production facilities. Except for the fact that they are formed on different machines, they are produced from the same raw materials and the same molten glass; sold at substantially the same price; sold and advertised together without reference to the production method; purchased by the same customers; displayed in the same section of stores; recognized by the industry members as competitive; and generally not distinguished by ultimate consumers.

Considered broadly, we think that, for purposes of this motion, the foregoing facts sufficiently demonstrate that machine-made glassware represents a cluster of products which have peculiar characteristics and uses, distinct from other products which we exclude from the market. *United States v. Philadelphia Nat'l Bank, supra.*

Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels. Products made of other substances, such as china, pyroceramics, pottery, plastic, paper and styrofoam, differ although they do have some similar functional uses. Borosilicate and heat-resistant glassware, typified by the pyrex product of Corning Glass and the Fire King product of Anchor Hocking, are distinguishable because of different technology and production methods, as well as different use characteristics and generally higher prices at which they are sold.

■ We conclude, therefore, that the FTC has shown, for purposes of this motion, sufficient industry recognition, commonality of production and marketing, and a reasonable interchangeability of use or cross-elasticity of demand between a cluster of machine-pressed and machine-blown moderately-priced soda-lime glassware to constitute an appropriate and single line of commerce in which to appraise the likely competitive effect of the challenged acquisition. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Philadelphia Nat'l Bank, supra*; *Brown Shoe Co. v. United States, supra*, 370 U.S. at 325, 82 S.Ct. 1502; *United States v. Manufacturers Hanover Trust Co.*, 240 F.Supp. 867 (S.D.N.Y.1965).

Having defined the relevant product market, we turn to the competitive structure of the market.

## C. Market Share

■ Statistics concerning market share and concentration are helpful analytical tools and of great significance, but they are not conclusive indicators that an acquisition will have an anticompetitive effect. An acquisition must be functionally viewed in terms of the competitive realities existing in a particular industry. Nevertheless, statistics reflecting market share remain the primary index of market power. *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1973); *United States v. Philadelphia Nat'l Bank, supra*; *Brown Shoe Co. v. United States, supra.*

It is not surprising, at this stage of the administrative proceedings, that the market share statistics presented by the FTC are sharply disputed. Respondents invite us to embark upon a detailed analysis of these statistics, although they concede that in the time available it is impossible for them to present opposing statistical evidence, and fall back on the argument that the burden is on the FTC.

Finally, it is not our function, nor can we hope to resolve these factual issues on this motion. These statistical matters are properly the subject of expert opinion, and we will, therefore, accept the affidavits of the FTC in that respect. However, we recognize that no magic inheres in numbers. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

There is no requirement that market structure be proved with mathematical certainty or perfect accuracy. *United States v. Philadelphia Nat'l Bank, supra.* Our concern, moreover, is not with certainties but with reasonable probabilities, for to require more would be to nullify the words "where the effect may be" in the Clayton Act and convert them to "where the effect is." *Brown Shoe Co. v. United States, supra*, 370 U.S. at 341 n. 68, 82 S.Ct. 1502. *A fortiori*, this is true on the instant motion, where our function is not to adjudicate the antitrust questions as such. We must, therefore, take a pragmatic approach and rely on such tools as we have in our consideration of the FTC's chances of ultimate success.

Moreover, we are admonished that wherever possible, without doing violence to the legislative objectives underlying the antitrust laws, we should "lighten the burden of proof," "simplify the test of illegality" and "[dispense] with elaborate proof of market structure, market behavior or probable anticompetitive effects." *United States v. Philadelphia Nat'l Bank, supra*, 374 U.S. at 362–63, 83 S.Ct. at 1741; *United States v. Manufacturers Hanover Trust Co., supra*, 240 F.Supp. at 926. If such an approach is appropriate where our function is to adjudicate the antitrust issues as such, *a fortiori* that approach is sound where, as here, our function is simply to consider the FTC's chances of success on those issues. We, therefore, will explore whether the market share obtained by this acquisition is presumptively illegal or decisive without regard to other factors.

The evidence before us shows the following market shares:

MARKET SHARES

Machine-Made Soda-Lime Glassware

| | 1976 | | 1974 | |
|---|---|---|---|---|
| Company | Sales (000) | Market Share (%) | Sales (000) | 1974 (%) |
| Owens-Illinois | 119,250 | 28.0 | 79,812 | 26.1 |
| Anchor Hocking | 98,685 | 23.1 | 78,505 | 25.7 |
| ⌐Federal Glass | 47,006 | 11.0 | 34,849 | 11.4 |
| Brockway Glass | 40,522 | 9.5 | 23,205 | 7.6 |
| Lancaster | 30,104 | 7.1 | 22,499 | 7.4 |
| Durand | 13,457 | 3.2 | N.A. | N.A. |
| Jeannette Corp. | 13,183 | 3.1 | 7,779 | 2.6 |
| Bartlett-Collins | 7,465 | 1.8 | 11,094 | 3.6 |
| Corning Glass | 0 | 0 | 0 | 0 |
| Other Imports | 52,836 | 12.4 | 47,389 | 15.5 |
| Other Domestic | 3,696 | 0.9 | 446 | 0.1 |
| | 426,204 | 100.1 | 305,578 | 100.0 |

4 firm = 71.6          4 firm = 70.8
combined = 18.1
4 firm after = 78.7

Machine-Made Soda-Lime Glassware

| | 1972 | 1974 | 1976 |
|---|---|---|---|
| 4 firm ratio | 64.3% | 70.8% | 71.6% |

▮ It cannot be gainsaid on the basis of the market share statistics that respondents are competitors and that the acquisition will result in the elimination of actual and potential competition between them and in a firm foreclosing 18.8%, or 19%, of the market. We think that fact, in itself, so nearly approaches the presumptively-illegal line [4] that we can conclude that the FTC has a good chance of ultimate success.

Moreover, the machine-made soda-lime glassware industry is highly concentrated. In 1976, the top four firms controlled 71.6% of the market, and although there is no evidence of a history of mergers, the trend toward increasing concentration is unmistakable, the four-firm ratio having increased from 64.3% in 1972 to 71.6% in 1976. The evidence shows that there have been no new entries in the market in recent years and that entry requires vast capital outlays. Federal is already the third leading producer, while Lancaster ranks fifth.

We are taught that:

" 'The dominant theme pervading congressional consideration of the 1950 amendments [to Clayton § 7] was a fear of what was considered to be a rising tide of economic concentration in the American economy.' *Brown Shoe Co. v. United States, supra,* 370 U.S. at 315, 82 S.Ct. 1518. See also *United States v. Continental Can Co., supra,* 378 U.S. at 461–62, 84 S.Ct. 1638; *United States v. Aluminum Co. of America, supra,* 377 U.S. at 278–81, 84 S.Ct. 1283; *United States v. Philadelphia National Bank, supra,* 374 U.S. at 362–70, 83 S.Ct. 1715. The 'keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. Congress saw the process of concentration in American business as a

4. *United States v. Aluminum Co. of America,* 377 U.S. 271, 278–81, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (29%); *United States v. Continental Can Co.,* 378 U.S. 441, 461–62, 84 S.Ct. 1738, 12

L.Ed.2d 953 (1964) (25%); *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 362–70, 83 S.Ct. 1715 (30%).

dynamic force; it sought to assure . . . the courts the power to brake this force *at its outset and before it gathered momentum.' Brown Shoe Co. v. United States, supra,* 370 U.S. at 317–18, 82 S.Ct. 1520 (emphasis added)." *United States v. Manufacturers Hanover Trust Co., supra,* 240 F.Supp. at 936.

Thus, the grand design of Clayton § 7 is to curb tendencies toward monopolies or oligopolies in their incipiency. If concentration is already high, or if there is a strong trend in that direction, even a slight or minute increase runs afoul of Clayton § 7. *United States v. Aluminum Co. of America, supra; United States v. Continental Can Co., supra.*

We think the FTC makes a tenable case that the industry is already one of few sellers, that comparatively few glass companies already control a disproportionately large share of the market, and that if that trend continues more and more glassware business and independent glass companies will be concentrated into fewer and fewer hands. Thus, we think the FTC shows prima facie that the addition to concentration caused or threatened by this acquisition thwarts the design of Clayton § 7 to arrest the trend toward oligopoly—the tendency to monopoly—in its incipiency.

We find it unnecessary to embark on a comparison of concentration ratios and the effects of mergers in other cases. Nor is there merit in respondents' contention that the acquisition will enable the resulting firm to compete more vigorously with the two largest glassware producers and thereby increase the vigor of competition. *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 370, 83 S.Ct. 1715.

The question is not whether concentration is greater or less here than elsewhere, but whether the FTC has a fair chance of showing that it threatens to reach anticompetitive proportions as a result of the planned acquisition. Thus, we conclude that the FTC has shown that it has a fair chance of ultimate success on the merits. Since there is a likelihood that the acquisition will ultimately be found to violate Clayton § 7, it necessarily follows that there is a substantial likelihood that the acquisition would violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. See *United States v. American Bldg. Maintenance Industry,* 422 U.S. 271, 279 n. 7, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975).

We turn, therefore, to consideration of the equities and public interest.

## EQUITIES AND PUBLIC INTEREST

■ The equities to be weighed here are not the usual equities of private litigation but public equities. *FTC v. Food Town Stores, Inc., supra,* 539 F.2d at 1344. It is axiomatic among economists that the public interest is best served by a market of many sellers. As previously noted, that was the principal thesis of the Clayton Act. The public interest factors militating against increases in concentration are fully reviewed in the Supreme Court's decision in *Brown Shoe Co. v. United States, supra,* and there is no need to repeat them here. Suffice it to say that if the aim of the Clayton Act to nip anticompetitive acquisitions in the bud is to be implemented, injunctions prohibiting those acquisitions serve the public interest.

■ The equities here, we think, weigh in favor of maintaining respondents as separate, independent, viable, competitive entities during the pendency of the administrative proceedings. If the acquisition is allowed to proceed but is later found to be violative of the antitrust laws, divestiture will be required. At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy. The legislative history of Section 13(b) reveals congressional concern with the FTC's historic inability to effectuate a remedy once an acquisition is consummated. 120 Cong.Rec. 36591–619 (1973).

The ineffectiveness of divestiture has been recognized by the Supreme Court in *FTC v. Dean Foods Co.,* 384 U.S. 597, 606 n. 5, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), where the Court said:

"But without standing to secure injunctive relief, and thereby safeguard its ability to order an effective divestiture of acquired properties, the Commission's efforts would be frustrated. * * * If

consummation of the merger is not restrained, the restoration of [the acquired company] as an effective and viable competitor will obviously be impossible by the time a final order is entered. This is not unusual. Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."

Indeed, Section 13(b) itself shows congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy and reflects a continuing congressional concern with the means of halting incipient violations of Clayton § 7 before they occur.

An agreement to operate these businesses as separate entities after the acquisition is not satisfactory because the acquisition would still eliminate actual and potential competition between respondents and would involve the court in constant supervision which it should not undertake. *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 163, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

■ Respondents argue that the planned acquisition will be abandoned if the preliminary injunction is issued and that the delay in consummation has already subjected them to inconvenience and expense, but, as noted in *FTC v. Food Town Stores, Inc., supra,* 539 F.2d at 1346:

> "All of these reasons go to the *private* injury which may result from an injunction delaying the merger. I do not minimize them, but I conclude that they are of such a nature that they are not proper considerations for granting or withholding injunctive relief under § 13(b). My conclusion in this respect is reinforced by recognition that many of them would result if any merger is enjoined on the eve of its consummation; yet Congress enacted § 13(b) authorizing injunctive relief, thereby indicating that it thought that little weight should be given to them."

Finally, it was surely no surprise to respondents that the acquisition might be challenged as violative of the antitrust laws. That such a challenge was foreseen is clear from respondents' agreement permitting Lancaster to withdraw its offer to acquire Federal's assets if the acquisition

was challenged as violative of the antitrust laws.

We conclude, therefore, that the equities weigh in favor of granting a preliminary injunction.

### CONCLUSION

We find that the FTC has shown that there is a likelihood that the acquisition of Federal by Lancaster will ultimately be held unlawful under the antitrust laws and that the weight of the equities and the public interest favor maintaining the status quo during the pendency of the administrative proceedings and any judicial review.

The foregoing memorandum constitutes this court's findings of fact and conclusions of law.

The FTC is directed to submit a preliminary injunction on or before July 25, 1977. The temporary restraining order will remain in effect until the preliminary injunction is issued and filed.

So ordered.