**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

**RHINECHEM CORPORATION, Allegheny Ludlum Industries, Inc., and Chemetron Corporation, Respondents.**

No. 78 C 3445.

United States District Court,
N. D. Illinois, E. D.

Oct. 20, 1978.

Lawrence E. Christensen, Chicago, Ill., for petitioner.

Charles W. Douglas, H. Blair White, Sidley & Austin, Chicago, Ill., Thomas L. Van Kirk, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for respondents.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court upon petitioner's Application for a Preliminary Injunction. For the reasons set forth below, the motion is granted.

The Federal Trade Commission (FTC) is an agency of the United States Government charged by law with, *inter alia*, the enforcement of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, and the Clayton Act, 15 U.S.C. § 12 *et seq.* Rhinechem Corporation (Rhinechem), a Delaware corporation with its principal place of business in New York City, is a wholly owned subsidiary of Bayer International Finance N.V., a Netherlands Antilles corporation, which, in turn, is a wholly owned subsidiary of Bayer A. G. (Bayer), a large West German manufacturing corporation. Allegheny Ludlum Industries, Inc. (ALI) is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business located therein. ALI transacts business within this district. Chemetron Corporation (Chemetron) is a Delaware corporation which both has its principal offices and transacts business within the Northern District of Illinois. The court is satisfied that respondents are engaged in "commerce" as defined in section 4 of the FTC Act, 15 U.S.C. § 44, and in section 1 of the Clayton Act, 15 U.S.C. § 12.

On June 9, 1978, Rhinechem agreed in principle to purchase the pigments division of Chemetron from ALI. On August 25, 1978, the three companies entered into a written agreement providing that the sale be consummated on August 30, 1978, or such other date as fixed by them. Pursuant to its belief that that agreement violated section 5 of the FTC Act, 15 U.S.C. § 45, and that the acquisition, if consummated, would be unlawful under section 5, as well as section 7 of the Clayton Act, 15 U.S.C. § 18, the FTC issued an administrative complaint against respondents on August 25, 1978. Further, as it felt that the maintenance of the status quo during the pendency of the administrative proceedings would be in the public interest, the FTC brought suit to preliminarily enjoin the proposed purchase under section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

That section gives this court jurisdiction over this case. Respondents have chosen not to challenge the FTC's choice of venue.

## THE STATUTORY STANDARD

Section 13(b) provides, in pertinent part, that

(b) Whenever the Commission has reason to believe—

(1) that any . . . corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . . .

■ This statutory enactment manifests Congress' "concern with the FTC's historic inability to effectuate a remedy once an acquisition is consumated". *FTC v. Lancaster Colony Corp., Inc.,* 434 F.Supp. 1088, 1096 (S.D.N.Y.1977) (citation omitted). This concern is reflected in the unique "public interest" standard of judicial scrutiny of requests for injunctive relief contained in section 13(b). As the legislative history of that section makes clear, "the traditional 'equity' standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner", H.R.Rep. No. 624, 93d Cong., 1st Sess. 31, *reprinted in* 2 U.S. Code Cong. and Admin. News, pp. 2523, 2533 (1973), does not apply to FTC-initiated ac-

tions under section 13(b).[1]  *FTC v. Beatrice Foods Co.,* 188 U.S.App.D.C. 438, 580 F.2d 701 (1978);  *FTC v. Lancaster Colony Corp.,* 434 F.Supp. 1088 (S.D.N.Y.1977);  *FTC v. Food Town Stores, Inc.,* 539 F.2d 1339 (4th Cir. 1976). Rather, the FTC must demonstrate "that, weighing the equities and considering the Commission's likelihood of ultimate success, such action [the issuance of an injunction] would be in the public interest." Therefore, the court must now examine the showing that the FTC has made in the instant case in light of its identification of these as the relevant factors.

## THE LIKELIHOOD OF SUCCESS

In the case at bar, the FTC maintains that Rheinchem, through its several subsidiaries, particularly its wholly owned subsidiary, Harmon Colors Corporation (Harmon), and Chemetron are competitors in an American organic pigments market. It assigns them positions among the top firms in that market, according to size. It views the proposed acquisition, therefore, as resulting in the diminution of the competition in this industry, and it contends that the sale would have definite anticompetitive effects.

Respondents, on the other hand, deny the existence of an organic pigments market. They suggest that the proper market within which the merits of this transaction should be assessed is either an American colorants market or the submarkets thereof defined by colorants' end-uses.[2] Consequently, they regard the proposed acquisition as a kind of diversification. They propose that this purchase will result in the improvement of the quality of competition within the relevant product market, whichever of the alternative positions on the appropriate market definition is accepted.

1. In *FTC v. National Commission on Egg Nutrition,* 517 F.2d 485 (7th Cir. 1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), the Court of Appeals for the Seventh Circuit had occasion to consider the impact of the adoption of section 13(b) upon its previous construction of section 13(a). Primarily, the court was interested in demonstrating that the enactment of section 13(b) was *not intended to* effect section 13(a). In this connection, it

made a number of suggestions about the construction of section 13(b) itself that this court feels it would not follow upon plenary consideration. Therefore, this court deems *Egg Nutrition* not to be controlling precedent in this case.

2. The FTC concedes that, if this market definition is adopted, it cannot justify the relief sought in this court.

Section 7 of the Clayton Act prohibits acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." Thus, "[d]etermination of the relevant product and geographic markets is a 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974) (citations omitted).[3]

■ As was pointed out by the Seventh Circuit Court of Appeals in *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977), *cert. denied,* —— U.S. ——, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978),

[I]n determining what constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971). The "area of effective competition" may be a small submarket supplying specialized products or services. . . . In delineating a relevant submarket, we are to look at

such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

The most important of these factors is uniqueness of the product's functions and therefore its uses. If two products are "reasonably interchangeable by consumers for the same purposes." they are considered to be in the same market. . . . We have said on two relatively recent occasions, however, that a market definition "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc. supra*, [7 Cir.] 516 F.2d [1092] at 1095, quoting from *L. G. Balfour Co. v. FTC, supra*, 442 F.2d at 11, which in turn quotes from *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958).

*Id.* at 710 (citations omitted).

■ The definition of a relevant product market is a factual question. *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 948 (5th Cir. 1975); also see *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d at 709. In support of their respective positions on that question, the parties have introduced extensive affidavits and numerous exhibits. In addition, the court held a limited evidentiary hearing, at respondents request.

After examining all of the proffered evidence, the court has come to the following conclusions concerning the propriety of petitioner's proposed market definition. The FTC has introduced much competent evidence in its favor, including, *inter alia*, evidence of industry and consumer recognition of the existence of a discrete organic pigments market; generic peculiarities of organic pigments, from the point of view of their production and use; non-elasticity of price between organic pigments and other colorants; and actual non-competition between organic pigments and other colorants, in terms of the end-uses to which they are put. Almost every one of these alleged facts have been contested by respondents' experts. Thus, as it stands at this time, the evidence before the court on the product market definition question amounts to a significant contest between each side's experts.

Although this record might not support injunctive relief under the traditional equitable standard, which demands that a petitioner show a "reasonable likelihood of success on the merits," *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976), it is deemed sufficient to merit the relief requested under section 13(b). Specifically, the court is of the opinion that the FTC has

3. Both sides agree that the United States is a relevant geographic market.

made an adequate showing on the issue of product market definition, as it "has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation, and determination by the FTC in the first instance and ultimately by the Court of Appeals". *FTC v. Lancaster Colony Corp., Inc.*, 434 F.Supp. at 1091, quoted with approval in the Memorandum accompanying the panel decision in *FTC v. Beatrice Foods Co.*, 188 U.S.App. D.C. 438, 580 F.2d 701 (1978), approved in *FTC v. Beatrice Foods Co.*, (1978) (en banc) (Joint Statement of MacKinnon and Robb, JJ.), 190 U.S.App.D.C. —— at ——, ——, 587 F.2d 1225 at 1226, 1230.[4] Accordingly, the court must consider the impact of the proposed purchase upon competition within the American organic pigments market.

While the question of market shares within this market has been the subject of sharp disagreement between the parties in this case, the court does not regard the outcome of this quarrel as a significant matter, in terms of its disposition of this petition. Even accepting the figures offered by respondents, this acquisition would fall within the category of suspect transactions under the Department of Justice's Merger Guidelines. While the court recognizes that those Guidelines are not binding upon it, upon similar showings, courts have held such statistical evidence to constitute a *prima facie* showing of illegality. *See, e. g., Chemetron Corp. v. Crane Co.*, C.C.H. 1977–2 Trade Cases ¶ 61717 (N.D.Ill.1977).

Respondents seek to rebut this *prima facie* case by alleging that certain specific pro-competitive effects will follow from this acquisition.[5] They assert that it will enable Chemetron and Harmon to better compete with the industry leaders (who would no longer be such in the event that this deal was consummated) by virtue of its synergistic effect on their research and development programs and its better enabling them to finance the construction programs needed to carry out their obligations under the various pollution control laws. However, the basis of the former statement, which was made only by an expert with no actual knowledge of the facts concerning research and development programs in organic pigments industry, was contradicted by respondents' main expert witness, Mr. Saltzman. As for the second claimed pro-competitive effect of this acquisition, even if, despite the substantial size of their parent corporations, Harmon and Chemetron would be better able to obtain necessary funds as a result of this merger, this court cannot say that respondents have made a substantial enough showing on this point to rebut the *prima facie* case established by the FTC's statistics.

If anything, the court considers that the nonstatistical evidence in the record tends rather strongly to support the implications of anti-competitive impact which are found in respondents' suggested market share figures. The testimony is unanimous regarding the barriers to entry in the organic

4. While it subscribes to what it perceives to be the underlying rationale of *Lancaster Colony,* this court does not endorse the "fair and tenable chance of ultimate success" characterization of the "likelihood of success" standard enunciated therein. The phrase "fair and tenable" seems to be less informative than the detailed elaboration of *Lancaster Colony*'s "likelihood of success" standard itself, which this court quotes and follows in the text above. This full articulation of the basis upon which a district court should make its determinations in cases under section 13(b) has the additional virtue of keeping the courts' sights fixed on their primary responsibility in section 13(b) cases, as that was expressed in *Lancaster Colony* :

> The central issue for us is not whether respondents have violated, or are about to violate, the antitrust laws, for adjudication of those issues is vested in FTC in the first instance. . . . Rather, the question for us is whether the FTC has shown prima facie that the public interest requires that a preliminary injunction issue to preserve the status quo until the FTC can perform its adjudicatory function.

434 F.Supp. at 1090 (citations omitted). (This court would not, however, deem the showing required of the FTC to be a "prima facie" showing of where the public interest lies, but something more.)

5. Respondents do not claim that Harmon or Chemetron is a failing company.

pigments industry. Not one firm has made a successful *de novo* entry in this market in the last twenty years. Bayer attempted it, but even with the expenditure of a not inconsiderable effort, its attempted entry failed. Thus, the increase in the overall concentration in the organic pigments industry wrought by this acquisition would not likely be mitigated by the entry of new firms into the market. Moreover, there is considerable trustworthy evidence before the court that indicates that, if not for this purchase, Harmon and Chemetron had planned on increasing their head-to-head competition in what, for the purposes of this motion, may be described as the various end-use submarkets. Obviously, in addition to the more general anticompetitive effect of this transaction noted above, intra-market competition would also be reduced in this more particular respect.

On balance, the court finds that the FTC has made a sufficient showing of its "likelihood of ultimate success" to merit its consideration of the equities in this case.

### EQUITIES

Respondents claim that the equities here are in its favor for two principal reasons. First, they point to the fact that ALI has stated, on the record in this court, that it will certainly abandon the proposed sale if a preliminary injunction is issued, thereby injuring the parties and the public, insofar as the latter would forfeit the allegedly procompetitive effects of the acquisition. Second, they claim that as the Harmon and Chemetron have separate production facilities, divestiture would prove a fully adequate remedy, should the FTC conclude, and perhaps a Court of Appeals, as well as (maybe) the Supreme Court, agree, that the purchase was in fact unlawful.

Before addressing itself to these particular claims, the court deems it advisable to reiterate several aspects of its interpretation of the applicable statute. Section 13(b) in part reflects Congress' dissatisfaction with the efficacy of divestiture as a remedy in antitrust cases. To achieve its goal of facilitating successful governmental intervention before the eggs are even cracked, thereby relieving the government from the necessity of trying to unscramble them at some later date, Congress has rendered the traditional equity requirements inapplicable in a section 13(b) suit. In so doing, Congress has commanded the courts to modify, in those cases, their traditional approach to the issuance of preliminary injunctions. It is in this spirit that this court must evaluate respondents' claims.

The court finds respondents' arguments to be unpersuasive. To begin with, the court has received little more than speculation about the existence of the alleged procompetitive effects. To say the least, respondents' showing on this point has not been compelling. Next, the court must confess that it is not impressed by respondents' claim that these eggs may so easily be unscrambled. After acquiring Harmon, Bayer quickly set up and put to use a network of communications for exchanging various data—technical and marketing data—between it and various of Bayer's European personnel. There is no reason to believe that such transfers of information, possibly including data of the type that many of the companies in this industry have insisted in this court is of the most confidential nature, would not go on between "Harmon" and "Chemetron," were the two companies to be joined via this purchase. Indeed, this is not mere speculation on the part of the court. It is precisely such technical exchanges that, according to Dr. Goodman, would cause this transaction to have "desirable" synergistic effects upon the two firms' research and development programs. Divestiture would be manifestly ineffective as a means of remedying this possible adverse effect of this transaction, should that prove necessary. In addition, while the parties may now be able to honestly represent to this court that they have no current plans to mesh their production facilities, they may also change their minds about this before the potentially lengthy process of FTC decision making and appellate review had reached a conclusion. In that case, the parties would have to come

back before this court and duplicate the proceedings that they have just been through, which would not represent the most efficient use of this court's time and energies, or those of the parties themselves. At the very least, this resolution of the present motion might well "involve the court in constant supervision which it should not undertake." *FTC v. Lancaster Colony Corp.*, 434 F.Supp. at 1097.

■ That leaves the claimed injury to the respondents owing to ALI's announced intention of walking away from the acquisition. The same general phenomenon has been encountered in other cases, and this court endorses the response thereto that was articulated by the court in *Lancaster Colony*. The short of that response is that the equities, and consequently the injuries, to be reckoned in section 13(b) cases are not private ones, but public ones. As Judge Winter noted in *Food Town Stores*,

> All of these reasons go to the *private* injury which may result from an injunction delaying the merger. I do not minimize them, but I conclude that they are of such a nature that they are not proper considerations for granting or withholding injunctive relief under § 13(b). My conclusion in this respect is reinforced by recognition that many of them would result if any merger is enjoined on the eve of its consummation; yet Congress enacted § 13(b) authorizing injunctive relief, thereby indicating that it thought that little weight should be given to them.

539 F.2d at 1346.[6] The court agrees with the judgment of Judge MacMahon in *Lancaster Colony* that this conclusion is particularly appropriate where, as in that case and this case, the alleged private injury is caused by the parties' own decision to, in effect, cancel the deal in the event that an injunction be issued.

■ As against these equities on respondents' side, there are substantial equities on the side of the FTC. "Suffice it to say that if the aim of the Clayton Act to nip anticompetitive acquisitions in the bud is to be implemented, injunctions prohibiting these acquisitions serve the public interest." *FTC v. Lancaster Colony*, 434 F.Supp. at 1096. In light of what it perceives to be the intent of the Congress in enacting section 13(b), this court believes that, where, as here, a sufficient showing of a likelihood of success has been made by the FTC, a great weight is to be assigned to both the potential injury to the public stemming from the loss of actual competition between the acquiring and the acquired company pending the ultimate resolution of the fate of the FTC's complaint and the lingering injury caused thereby, as well as to the potential injury to the public caused by the acknowledged shortcomings of the remedy of divestiture.

Therefore, even if the private injury to respondents be taken into account, the court considers the balance of the equities to lie markedly on the side of the FTC.

## PUBLIC INTEREST

■ As the FTC has both made an adequate showing as to its "likelihood of ultimate success" and established that the equities in this case favor its position, the court concludes that the entry of an injunction during the pendency of the administrative proceedings and any subsequent judicial review would be in the public interest.

## CONCLUSION

Accordingly, the FTC's application for the issuance of an injunction during the pendency of the administrative proceedings and any subsequent judicial review is granted.

It is so ordered.

---

**6.** As a result of Judge Winter's decision in *Food Town Stores*, the merger in that case was abandoned. *FTC v. Food Town Stores, Inc.*, 547 F.2d 247 (4th Cir. 1977).