**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**VERITY INTERNATIONAL,**
**LTD., et al., Defendants.**

No. 00 CIV 7422 LAK.

United States District Court,
S.D. New York.

Dec. 13, 2000.

Lawrence Hodapp, David M. Torok, Federal Trade Commission, Washington, DC, for Plaintiff.

Patrick J. Coyne, Richard H. Kjeldgaard, Scott A. Sinder, John E. Villafranco, Collier Shannon Scott PLLC, Washington, DC, Guy Petrillo, Swidler Berlin Shereff Friedman, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendants operate a billing service for Internet pornographers. Web sites containing what defendants euphemistically refer to as adult content ascertain the telephone numbers from which visitors to the sites accessed the Internet through a system known as Automatic Number Identification ("ANI"). Defendants then bill the subscribers of those telephone numbers—who may or may not be the same persons who accessed the web sites—for access to the pornographic materials, although most of the bills here at issue described the services for which the bills were rendered as telephone calls to Madagascar. Defendants insist upon payment by line subscribers irrespective of whether the line subscribers used or authorized the use of their telephone lines to access the web sites of defendants' clients.

The Federal Trade Commission ("FTC" or "Commission") contends principally that defendants' insistence that line subscribers are legally obligated to pay for access to their clients' web sites, even where the line subscribers neither used them nor autho-

rized such use, violates Section 5(a) of the Federal Trade Commission Act (the "Act").[1] The matter now is before the Court on the FTC's motion for a preliminary injunction.

### Facts [2]

Verity International, Ltd. ("Verity")[3] bills and collects for access to materials offered by operators of sexually oriented web sites without requiring those who access the sites to provide a credit card number over the Internet. Although the system has undergone a number of changes over time, the core concept has been constant. A computer user employs his or her modem, telephone line and normal Internet service provider ("ISP") to connect to a web site operated by a Verity client. The user then is presented with a series of screens which together purport to set forth terms and conditions of use. On the last of the screens, the user is presented with a box that states "I Agree."[4] If the user clicks that box, a dialer computer program is downloaded from the web site to the user's computer. The dialer program then automatically disconnects the user's computer modem from the user's ISP and reconnects the user's computer to the same web site by placing a call to an international telephone number assigned by the relevant country to a Verity affiliate, Automatic Communications Limited ("ACL").[5] The user then views the wares

of Verity's client. Verity or an affiliate then uses the ANI system to ascertain the identity of the subscriber to whom the telephone line employed by the user is assigned, who may or may not be the user who agreed to use the web site, and bills the line subscriber for use of its client's web site, currently at the rate of $3.99 per minute.

### The Original System

Verity's system dates back to approximately 1999, when ACL and its agents (including Verity) worked out an arrangement with Telecom Madagascar ("TM"), the national telecommunications carrier for Madagascar, whereby ACL was appointed TM's agent for a series of telephone numbers allocated to Madagascar by international telephone authorities. Under the appointment, TM assigned to ACL the right to receive revenues from those numbers, the right to direct that payment for calls to those numbers be made to ACL or its designee rather than to TM, and the right to terminate calls to those numbers at any location that ACL desired, even at locations outside Madagascar.[6]

In January 1999, AT & T entered into an agreement with ACL and TM to handle call traffic to the Madagascar number range assigned to ACL and to bill the calls through regular monthly statements to customers in exchange for half of the reve-

---

1. 15 U.S.C. § 45(a).

2. As no party sought an evidentiary hearing, none was held. Tr., Oct. 30, 2000, at 36.

3. Defendants asserted at oral argument that the Verity named in the complaint actually is the wrong entity, that it changed its name some time ago to Hamilton Telecommunications Ltd. ("Hamilton"), and that the correct entity is Verity International Ltd., a Bahamian company. Tr., Oct. 19, 2000, at 7–8. The two entities, however, appear to be under common ownership, as both appear to be owned by defendants Green and Shein. *See* Stipulation of Agreed Facts ("Stip.") ¶¶ 2, 4; PX 114; Green Decl., ¶ 1; Tr., Oct. 19, 2000, at 7–8. The point, however, is academic in view of the Verity Defendants' "assurance that in spite of the misjoinder, we have treat-

ed this [i.e., Hamilton] as the Verity International Company in the Bahamas, that it is subject to the court's jurisdiction and is complying with the TRO, not the Hamilton Communications entity." *Id.* at 8.

4. For reasons that are far from apparent, the FTC has not contended that the disclosure contained on these screens is inadequate or misleading.

5. As will appear, the placement of the call to the international telephone number does not necessarily mean that the call is connected to the country to which the number is assigned.

6. TM evidently was willing to enter into this arrangement in exchange for a portion of the revenues generated.

nue. The charges appeared on customer telephone bills as charges for telephone calls to Madagascar telephone numbers although no calls ever were put through to Madagascar.[7]

By May 2000, ACL's call volume through AT & T had reached one million minutes per month. Although there is reason to believe that a substantial number of users refused to pay AT & T's bills for these services,[8] thus suggesting widespread consumer dissatisfaction, there is no need to resolve that issue for purposes of this motion.

*Verity Adopts Direct Billing*

In May 2000, AT & T terminated its agreement with ACL, which set out to make alternative arrangements. By July 2000, ACL had arranged to have Sprint Communications Company handle the call traffic[9] and, after a brief period of billing through Sprint,[10] it decided to bill line subscribers directly (rather than through their telephone bills) and to transfer billing responsibility to Verity. Verity in turn contracted with Integretel, Inc. ("Integretel") to prepare[11] and mail the bills, collect payments, and answer a toll-free "customer service" number printed on the bills. Integretel involved its subsidiary, eBillit, Inc. ("eBillit") in these activities and subcontracted the job of handling billing inquiries.[12]

Verity began billing line subscribers on separate billing statements for use of its clients' web sites in the first week of September for July services. Shortly thereafter, it sent out a new round of bills for August. All told, it sent approximately 67,000 bills during the week of September 11 and another 44,000 bills during the following week.[13]

At the top of the bills sent to line subscribers appeared Verity's name and the address of a non-existent post office box[14] in San Jose, California. The address to which payments were directed was a different San Jose post office box registered to Integretel. The bills included a summary of charges and a chart of details about them—the date, time, destination (Madagascar), telephone number called, duration and charges per call. Under the heading "INTERNET BILLING," the first page stated that "THIS BILL ACCOUNTS FOR INTERNATIONAL CALLS, FROM YOUR MODEM TO A MADAGASCAR NUMBER, FOR WEBSITE ACCESS." On the bottom right, the bill read, "For questions about your invoice please call (800) 793–1418."[15]

*Disaster Strikes*

The implementation of Verity's new system was a disaster. Part of the problem, as the Verity defendants essentially admit,[16] was a customer service failure. Initially, only one telephone line was available

---

7. ACL arranged with British Telecom to "short stop" calls to its Madagascar numbers in London and to route them to servers operated by its clients, the providers of the pornographic material.

8. AT & T billed approximately $30,618,447 and gave adjustments or charge backs (that is, money credited back to consumers) of $11,268,778 for connections to these Madagascar numbers during the period in which it carried these calls. *See* PX 128 ¶ 7.

9. *See* Stip. ¶ 26.

10. *See* DX 1.

11. Integretel received information about each call (originating telephone number, destination, time and length of call) from Sprint in

electronic format and matched the numbers with billing addresses supplied by local exchange carriers. Calcagno Decl. ¶ 6; DX 6.

12. *See* Calcagno Decl. ¶ 9.

13. PX 101, at 4.

14. *See* PX 102, at 2 (statement of Postal Inspector Bonnie Bone).

15. *See* PX 1–81.

16. *E.g.,* Def. mem. in support of motion to vacate or modify the temporary restraining order, 6–8.

for line subscribers calling the 800 number with complaints and inquiries, and it quickly was overwhelmed so that calls were dropped or placed on hold indefinitely.[17] Customer service personnel were not adequately trained. Many pressured callers to pay the bills or told them that they had no other option.[18] Others were misdirected by directory services to an entirely unrelated company in California, which in turn directed the complaints to the FTC.[19] Those who tried to e-mail <info@verityinternational.com> instead of calling the 800 number had no more luck in getting a response: at least one received an e-mailed description of the way the program is downloaded and a copy of a disclaimer.[20] But the customer service failure, in many ways, was the least of the problems.

The FTC received 548 complaints about Verity in the period September 18 through September 22, 2000.[21] The complaints were variations on a theme. Line subscribers said they had neither made nor authorized the calls: the computer at issue was in the line subscriber's possession and switched off at the time the calls allegedly were made;[22] a minor child in the household downloaded the program without authorization;[23] the line subscriber billed had both a 900 block and an international-call block on the line;[24] or the computer at issue was on-line with another web-based program at the time the call purportedly was made.[25] The FTC has submitted in support of this motion 81 declarations from recipients of these bills who assert that they did not access or authorize anyone to use their telephones to access the services for which Verity billed them.

Notwithstanding this evidence, the Verity defendants stoutly argue that every call for which they billed in fact was made from the line subscriber's line to the Madagascar numbers assigned to ACL and that Sprint's call records indisputably so establish. The record at this point is insufficient to determine whether this is so, but in large measure the argument is beside the point. The record is more than sufficient to establish, and the Court finds, that a significant number of line subscribers to whom Verity sent bills did not themselves use, or authorize others to use, their lines to access the services of Verity's clients, even assuming that someone else used their lines to do so. And that is the critical factual premise of the FTC's position—that these defendants have engaged in unfair and deceptive practices by billing and insisting upon payment by line subscribers even where the line subscribers did not themselves agree to pay.

*Prior Proceedings*

The FTC commenced this action on October 2, 2000 against Verity, its principals Robert Green and Marilyn Shein, Integretel and eBillit. The amended complaint contains three claims for relief. Counts One and Two assert that defendants' express and implied representations that line subscribers whose telephones were used to access web sites are legally obligated to pay defendants for access irrespective of whether the line subscribers actually accessed or authorized the access of the web sites are false and deceptive, and unfair, respectively, and therefore violate Section 5(a) of the Act.[26] Count Three contends that defendants' practice of causing charges to appear on bills as charges for

17. *See, e.g.,* PX 2; PX 6; PX 11, at 1; *see also* DX 1, ¶ 17; DX 2, ¶ 18.

18. *See, e.g.,* PX 1, at 2; PX 3, at 1.

19. *See* PX 1, at 1; PX 7, at 1; PX 9, at 1; PX 10, at 1.

20. *See* PX 1, at 5, 9.

21. *See* PX 106, at 2.

22. *See* PX 1, at 1.

23. *See* PX 3, at 1.

24. *See* PX 9, at 1.

25. *See* PX 12, at 4.

26. Am. Cpt. ¶¶ 22–28.

calls to Madagascar, when the calls in fact terminated elsewhere, is deceptive and also violates Section 5(a). It promptly sought injunctive and other relief pursuant to Section 13(b) of the Act.[27]

On the day the action was commenced, the Court granted the Commission's *ex parte* application for a temporary restraining order which, *inter alia*, enjoined defendants from continuing their billing practices and froze and ordered repatriation of assets of Verity, Green and Shein in order to ensure the Court's ability to grant effective relief. At a hearing on October 4, 2000 at which all parties were represented, the Court continued the restraining order. As counsel for the Verity defendants at the hearing was not authorized to agree to continuation of the restraining order pending hearing and determination of the motion for a preliminary injunction, the order was continued through October 17. On October 6, however, the Verity defendants consented to continuation of the restraining order pending the hearing and determination of the preliminary injunction motion,[28] and the argument of that motion was scheduled for October 30.[29]

Notwithstanding this agreement, the Verity defendants on October 18 moved to vacate the temporary restraining order, an application the Court heard on October 19. In substance, Verity took the position that it had adopted changes in its business methods which addressed all of the Commission's concerns save ANI based billing

of line subscribers and offered to consent to a preliminary injunction requiring compliance with its newly announced practices. The Commission, however, rejected Verity's offer so the preliminary injunction motion and the motion to vacate were heard on October 30, 2000. The Verity defendants expressly waived an evidentiary hearing.[30]

### Discussion

#### I. The Narrow Scope of the Remaining Dispute

The scope of the dispute has narrowed since the institution of this action. The FTC asks the Court to enjoin defendants from representing that the line subscriber must pay for services that he or she did not expressly authorize and from misrepresenting the destination of any long distance call or the amount owed for services actually rendered. More specifically, it seeks an order prohibiting the Verity defendants from billing any line subscriber "without the express verifiable authorization from the line subscriber that he or she accepts or authorizes the purchase of such services."[31] In addition, it seeks an asset freeze, repatriation of assets and complete financial statements from defendants.

The Verity defendants have proposed their own form of "preliminary injunction." Their proposed order would continue the freeze on collections from the September bills already frozen although it would give defendants access to future receipts.[32]

---

**27.** 15 U.S.C. § 53(b).

**28.** Letter, Sean A. Moynihan to Court, Oct. 6, 2000; *see* Tr., Oct. 19, 2000, at 4.

On December 1, 2000, the Verity defendants filed a document entitled "praecipe withdrawing consent to continue temporary restraining order pending disposition of preliminary injunction motion" which purported to withdraw their consent to continuation of the restraining order, effective December 11, 2000. Inasmuch as these defendants gave unqualified consent to continuation of the restraining order pending a decision on the pending motion, their purported withdrawal was ineffective. The issue, however, is academic, as the Court on December 8, 2000 once again con-

tinued the temporary restraining order pending this decision.

**29.** The temporary restraining order, insofar as it applied to Integretel and eBillit, was vacated by agreement between those defendants and the Commission. *See* Order, Oct. 10, 2000.

**30.** Tr., Oct. 30, 2000, at 35–36.

**31.** Plaintiff's proposed order for preliminary injunction and other equitable relief, § II.

**32.** Defendants' proposed preliminary injunction pending expedited trial on the merits ("Def.Prop.Inj.") ¶¶ 2–3.

And it would permit them to continue ANI-based billing of line subscribers, without express verifiable authorization from the line subscriber that he or she accepts or authorizes the purchase of services, provided they adhere to certain terms and conditions which, they argue, would protect consumer interests.[33] But it does not dispute the proposition that the Commission is entitled to some appropriate relief. Thus, the principal remaining areas of significant dispute on this motion are whether and on what terms these defendants should be permitted to continue ANI-based billing of line subscribers without express verifiable authorization by the line subscribers and the scope of the asset freeze.

## II. Standard for Preliminary Injunction

■ The FTC may obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."[34] The standard differs from that applicable to private applicants for such relief. "The intent is to maintain the statutory or 'public interest' standard which is now applicable, and not to impose the traditional 'equity' standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner."[35] That is, the FTC does not have to show irreparable harm,[36] but the Court must (1) determine that the FTC has a fair and tenable chance of ultimate success on the merits[37] and (2) consider the equities.[38]

## III. ANI-based Billing of Line Subscribers

As noted, the FTC alleges that defendants violated and continue to violate FTC Act Section 5(a) by making the false and deceptive representation that line subscribers are legally obliged to pay for website access[39] and by unfairly billing line subscribers even if those subscribers did not access the site, download the dialing program, or authorize either action.[40] Based on the evidence now before the it, the Court finds that the FTC is likely to

**33.** Among the terms and conditions are the use of a new on-line disclosure statement, removal of references on bills to calls to "a Madagascar number," inclusion on bills of a statement that the line subscriber is not obliged to pay "[i]f someone uses your telephone line to access our service without your authorization," provision of clear and conspicuous information as to billing inquiries, and maintenance of an adequate call center for billing questions. *Id.* ¶ 1.
Defendants' proposed order, it might be noted, arguably would not enjoin them from using ANI-based billing of line subscribers even where defendants do not comply with their proposed terms and conditions, although this appears to have been a drafting oversight. *See* Tr., Oct. 30, 2000, at 31.

**34.** 15 U.S.C. § 53(b) (1994 & Supp.).

**35.** H.R. Conf. Rep. No. 624, 93d Cong., 1st Sess. 18 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2533.

**36.** *See FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1233 (9th Cir.1999).

**37.** *See United States v. Sun & Sand Imps., Ltd.,* 725 F.2d 184, 188 (2d Cir.1984); *FTC v.*

*Lancaster Colony Corp.,* 434 F.Supp. 1088, 1090–91 (S.D.N.Y.1977).

**38.** *See Lancaster Colony Corp.,* 434 F.Supp. at 1096 ("The equities to be weighed are not the usual equities of private litigation but public equities.") (citing *FTC v. Food Town Stores, Inc.,* 539 F.2d 1339 (4th Cir.1976)). There is some disagreement among circuits about the weight to be given private hardship. *Compare Food Town Stores,* 539 F.2d at 1346 (concluding that private equities "are not proper considerations for granting or withholding injunctive relief under § 13(b)"), *with FTC v. Univ. Health, Inc.,* 938 F.2d 1206, 1225 (11th Cir.1991) ("While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight, lest we undermine section 13(b)'s purpose of protecting the 'public-at-large,' rather than individual private competitors.' ").

**39.** *See* Am. Cpt. ¶¶ 22–24.

**40.** *See id.* ¶¶ 25–28.

succeed in showing that these practices are deceptive and unfair.

## A. False and Deceptive Representations

■ To establish that defendants violated FTC Act Section 5(a) by engaging in unfair or deceptive acts or practices in or affecting commerce,[41] the FTC ultimately must demonstrate a material representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances.[42]

### 1. Legal Obligation to Pay

To prevail on its first claim for relief, the FTC must establish that (1) Verity's bills represented that line subscribers are legally obligated to pay irrespective of whether they used or authorized use of the services of defendants' clients, and (2) the representation was materially false or deceptive.

Although Verity's bills include the "Total Amount Due" and instruct consumers to detach and return a portion of the bill with payment, they do not state in so many words that the addressees are legally obligated to pay the sum claimed. Nevertheless, courts may not blind themselves to the common understandings of our society. One who tenders a bill thereby renders a statement of account.[43] The bill is a representation that the sum claimed in fact is due and owing and that the addressee is obliged to pay. Certainly recipients of bills ordinarily so understand, and the Court infers for purposes of this motion that this understanding is reasonable. Moreover, it is difficult to imagine a representation that would be more material, as the very point of a bill is to induce the recipient to rely on it and therefore to send defendants the money claimed. The only question of substance in this connection is whether defendants' bills, to the extent that they are sent to line subscribers who neither used nor authorized use of their lines to access the services of defendants' clients, are legally obligated to pay. If they are not, then the bills contained materially false representations.

■ Of course, many are familiar with the proposition that the subscriber to a telephone line is legally obligated to pay the telephone company and long distance carrier for any calls made on that line. The source of that obligation, however, is not as well known. Typically, the relationship between the line subscriber and the telephone company and long distance carrier is governed by tariffs filed with the Federal Communications Commission ("FCC").[44] Such tariffs "conclusively and exclusively enumerate the rights and liabilities of the contracting parties."[45] They

---

41. 15 U.S.C. § 45(a) (1994 & Supp.).

42. See FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir.1994), cert. denied, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir.1988); FTC v. Five–Star Auto Club, Inc., 97 F.Supp.2d 502, 526 (S.D.N.Y.2000) (McMahon, J.). The FTC does not have to prove that defendants intended their misrepresentations to defraud or deceive, or made them in bad faith. See, e.g., World Travel Vacation Brokers, 861 F.2d at 1029.

43. Cf. LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham, 185 F.3d 61 (2d Cir.1999) (explaining that, under New York law, the obligation to pay invoices must be based on a prior agreement to an account or might be implied if the party receiving the bill does not object within a reasonable time) (quoting Chisholm–Ryder Co. v. Sommer & Sommer, 70 A.D.2d 429, 431, 421 N.Y.S.2d 455, 457 (4th Dept.1979)).

44. Section 203(a) of the Act requires common carriers to file tariffs with the FCC and Section 203(c) makes it unlawful for a carrier to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." 47 U.S.C. § 203(a), (c).

45. Marcus v. AT&T Corp., 138 F.3d 46, 56 (2d Cir.1998) (quoting AT & T v. New York City Human Res. Admin., 833 F.Supp. 962, 970 (S.D.N.Y.1993)); see also AT & T v. City of New York, 83 F.3d 549, 552 (2d Cir.1996) ("The legal relationship between AT & T and its customers is defined by the tariffs, which consist of the terms and conditions of the common carrier's service and rates, that AT &

not only govern a carrier's rates to various destinations, but also set forth customers' obligations and carriers' duties. Customers are presumed conclusively to have knowledge of these filed rates and obligations[46] and courts therefore consistently have held that line subscribers are obliged to pay for telephone calls they never authorized.[47] These principles are known as the filed rate doctrine.[48]

■ Drawing implicitly on the filed rate doctrine, defendants argue that Verity is merely using ANI-based billing in a way that is common practice in the telecommunications industry. Defendants meet each of the FTC's consumer complaints and bills with a matching Sprint electronic code meant to demonstrate that the call indeed was placed as indicated on the bill. But the argument skips over a critical point.

The Court assumes *arguendo* that the calls, in all or most cases, in fact were placed from the line subscribers' telephones. But the filed rate doctrine would make the line subscribers responsible for those calls only if a filed tariff covering the particular line subscriber so provided. The FTC is likely to establish that this simply is not so.

The FCC long has distinguished between basic telecommunications carriage—principally ordinary telephone and long distance service—and enhanced services such as those offered by Verity's clients.[49] In *Amendment of Section 64.702 of the Commission's Rules and Regulations ("Computer II")*, for example, the FCC declined to institute comprehensive regulation for enhanced services and found that vendors of enhanced services, defined as anything more than basic transmission service, were not engaged in common carrier activity.[50] The Telecommunications Act of 1996 likewise distinguishes between telecommunications services and information services,[51] stating that "a telecommunica-

---

T is required to filed and maintain with the [FCC] under the FCA."); *cf. AT & T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 1964–65, 141 L.Ed.2d 222 (1998).

**46.** *See, e.g., Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Kansas City S. Ry. Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 57 L.Ed. 683 (1913); *Marcus*, 138 F.3d at 63.

**47.** *See, e.g., Am. Message Cents. v. FCC*, 50 F.3d 35 (D.C.Cir.1995) (denying petition to review FCC's determination that tariff required customers to pay for all completed calls); *New York Human Res. Admin.*, 833 F.Supp. at 962 (granting AT & T's motion for summary judgment in case of unauthorized access to the city's long-distance telephone service); *accord, AT & T v. Intrend Ropes & Twines, Inc.*, 944 F.Supp. 701 (C.D.Ill.1996); *AT & T v. Cmty. Health Group*, 931 F.Supp. 719 (S.D.Cal.1995); *AT & T v. Jiffy Lube Int'l, Inc.*, 813 F.Supp. 1164 (D.Md.1993).

**48.** The filed rate doctrine originally was associated with the Interstate Commerce Act tariff provisions. *See, e.g., Maislin Indus.*, 497 U.S. at 116, 110 S.Ct. 2759. The Supreme Court has held that the filed rate doctrine applies to the Communications Act as well. *See Cent. Office Tel.*, 118 S.Ct. at 1956 (1998); *MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218,

229–31, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

**49.** Pl. mem. of points & authorities supporting motion for temporary restraining order and order to show cause, at 4.

**50.** *See Amendment of Section 64.702 of the Commission's Rules and Regulations ("Computer II")*, 77 F.C.C.2d 384, 420, 0080 WL 233301 (1980) (defining "basic service" as the offering of "a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information"), *recon.*, 84 F.C.C.2d 50 (1980), *further recond.*, 88 F.C.C.2d 512 (1981), *aff'd sub nom. Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

**51.** *See* 47 U.S.C. § 153(46), (43) ("The term 'telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."); *id.* § 153(20) ("The term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . .").

tions carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." [52] While basic communications services long have been covered by filed tariffs, enhanced and information services have not. Thus, there appear to be no tariffs governing the rates or the terms and conditions upon which these services are offered. At any rate, defendants have pointed to none. In consequence, there appears to be no legal basis for defendants' contention that telephone line subscribers are legally obligated to pay charges for enhanced services accessed over their subscribed lines where the subscribers neither have accessed nor authorized access to those services. Indeed, the FCC has made clear that it is improper to rely solely on ANI as a basis for holding a line subscriber liable for information purchases made from his or her telephone line.[53]

In the absence of a legal obligation to pay based on the filed rate doctrine, the next question is whether a contract exists between the line subscriber and defendants. Assuming *arguendo* that clicking on "I accept" on the disclaimer screens forms a valid contract between the person who clicks and defendants or their clients, it suffices at this stage to note that basic contract principles provide that an offer and acceptance create a contract only between the offeror and the offeree. Indeed, where the person who accepts the offer is incompetent or a minor, the contract is voidable.[54] Accordingly, unless the line subscriber is the person who accepts the offer by clicking on the "I accept" box, there is no contract between the defen-

dants or their clients, on the one hand, and the line subscriber, on the other.

The bills sent out in early September in substance represented that line subscribers were obliged to pay for services accessed over their lines without regard to whether the line subscribers accessed or authorized access to the services. Insofar as these bills were sent to line subscribers who did not access or authorize access to the services for which payment was sought, the FTC is likely to establish that the bills made false and deceptive representations of material fact in suggesting that the line subscribers were obliged to pay the bills.

### 2. Call Routing

The facts underlying the FTC's third claim, that defendants violated Section 5(a) by billing consumers for telephone calls to Madagascar when the calls actually terminated in other countries with lower telephone rates, are not disputed. Defendants concede that the calls, "identified on the bills as being for calls 'to a Madagascar number, for website access'" were "actually terminated on a server located in London."[55] Also, the disclosure on the client web sites as it existed at the time the FTC's investigation began stated, arguably in misleading fashion, that "[i]nternational long distance telephone charges apply" and that "[y]our phone bill will reflect the charges as shown above on a per minute basis for the cost of the call."[56] It is unnecessary, however, to reach even tentative conclusions about this practice at this stage in view of defendants' representation that they will cease making any such refer-

---

52. *Id.* § 153(44) (defining "telecommunications carrier").

53. 9 F.C.C.R. 2819 (1994); *see also* 9 F.C.C.R. 6891 (1994).

54. *See, e.g., Petition of Yonnone,* 72 Misc.2d 579, 580, 339 N.Y.S.2d 212, 214 (Surr.Ct.Orange Co.1972) ("The general rule of law is that an infant has not the capacity to bind himself absolutely by contracts, since any contract made by him during his infancy may be avoided."); *see also* IE. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS §§ 4.2–4.4 (2d ed. 1998 & Supp.2000).

55. Motion to vacate or modify the temporary restraining order, at 3, 11.

56. *See* PX 101, at 6.

ences in the event the Court permits them to resume billing.

### B.   Unfair Practices Claim

■ The second count of the FTC's amended complaint challenges the ANI-based billing, as applied to line subscribers who have not used or authorized the use of the services offered by Verity's clients, as an unfair trade practice, also in violation of Section 5(a) of the Act. An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." [57]

The FTC has established that it likely will prove at trial that a significant number of line subscribers already have been billed without having made or authorized the calls, a substantial injury to these consumers. Defendants nevertheless contend that there has been no unfair trade practice because line subscribers reasonably may protect themselves against such injury by controlling access to the telephone lines over which their clients have been accessed. But the Court is not prepared to accept that assertion, at least at this point. For one thing, there is credible evidence that at least some line subscribers who have 900 number or long-distance blocks on their telephone lines nevertheless have been billed by defendants, thus suggesting that such blocking measures are imperfect. Further, at least at this preliminary stage, this Court finds that the Commission is likely to establish that avoiding misuse of their telephones by children of line subscribers and others with access to their lines imposes an unreasonable burden on many consumers, especially in comparison with the easy alternative sought by the Commission—a bar on imposing liability on line subscribers absent a verifiable agreement to be responsible for the charges.

The defendants argue also that consumers benefit from having an alternative to disclosing credit card information on the Internet. As a broad proposition, that probably is so.[58] Nevertheless, it does not carry the day, at least at this stage. Surely the availability of this alternative does not benefit line subscribers who do not use the service in the first place. On the contrary, they are victimized by the creation of a means that permits unauthorized users to shift costs from themselves to the line subscribers whose lines they abuse. Moreover, while the Court recognizes that defendants would be harmed by an order that effectively would require them to make pre-subscription agreements with line subscribers before charging them for their clients' services on an ANI-based basis, that harm is insufficient to tip the scales. The practical reality here is that many consumers who receive bills simply pay them. Others are not willing to engage in extended debates with billers, as they lack the time or energy or simply are fearful that an alleged creditor will damage their credit ratings and thus limit their access to credit unless they pay as demanded. The harm of which defendants complain would be the product of preventing defendants from capitalizing on the inattention and fear of consumers or on the disparity of power between them and the persons they bill to extract payments which, in many cases, probably are not rightfully theirs.

Defendants contend, finally, that they have an enormous universe of happy customers, claiming that during the period in which they billed through AT & T they had uncollectible charges of less than three percent.[59] But the evidence submitted by AT & T demonstrates that more than 35 percent of defendants' charges from Janu-

---

**57.**   15 U.S.C. 45(n) (1994 & Supp.).

**58.**   There probably also are consumers who benefit from defendants' service by conceal-ing the nature of their on-line activities from others by means of the deceptive bills.

**59.**   See DX 1 ¶ 11.

ary 1999 through September 2000 were uncollected,[60] a figure far in excess of the charge back levels experienced by online retailers and credit card companies.[61] This certainly suggests that there was dissatisfaction with defendants' activities even during the period when their charges misleadingly appeared on bills as fees for fictional telephone calls to Madagascar.

In all the circumstances, the Court holds that the Commission is likely to establish that defendants' ANI-based billing of line subscribers who have not themselves used or authorized use of defendants' clients' services is an unfair trade practice.

### IV.  Individual Liability

The FTC is entitled to relief against the individual defendants, Green and Shein, on a showing that they participated in Verity's wrongful acts or that they had the authority to control Verity and knew of the acts or practices.[62]  The FTC is likely to succeed in establishing the personal liability of Green and Shein in this case.  They are partial owners of Verity and directors of ACL.[63]  Green's declaration establishes his intimate involvement with the activities here at issue.[64]  When the late September disaster struck, Shein went to the call center in Florida handling the complaint calls to instruct the subcontractor's staff on responding to the 800 number listed on Verity's bill.[65]  The preliminary injunction therefore appropriately reaches Green and Shein as well as Verity.

### V.  Relief

As noted, defendants effectively concede that the Commission is entitled to some injunctive relief.  They propose, however, to continue to use ANI-based billing, but to provide improved disclosure on client web sites, to give post-bill concessions to consumers who complain about their bills, to permit injured consumers to block access to web sites using defendants' billing mechanism, and to post a $1 million bond as security for injured consumers while leaving the funds previously collected and frozen pursuant to the restraining order restrained.  The Commission objects that these measures are insufficient.

### A.  ANI–Based Billing

The fundamental point of contention is whether these defendants should be permitted to use ANI-based billing of line subscribers during the pendency of this litigation.  Given the Court's provisional conclusion that this practice, as defendants employ it, is likely to be found to violate the Act, one's initial reaction may well be negative.  But the question is more difficult.

Courts of equity must bear in mind that preliminary injunction rulings are based on incomplete records and therefore arguably have a higher probability of error than rulings after trial or on summary judgment.  Moreover, the relief sought here would have a drastic adverse impact on the defendants' business.  In consequence, the Court is reluctant to impose what might be a commercial death sentence at an interlocutory stage if there is some reasonable alternative.

The chief vice of the defendants' ANI-based billing is that it falsely represents to line subscribers that the line subscribers are responsible for services purchased from defendants clients even where the line subscribers neither purchased nor authorized the purchase of those services.  Defendants propose to address this prob-

---

60.  PX 129.

61.  *See* PX 130, at 2.

62.  *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989); *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 535 (S.D.N.Y.2000).

63.  *See* Stip. ¶¶ 2, 4, 6.

64.  *See* DX 1.

65.  *See* Calcagno Decl. ¶ 9c.

lem by using an improved disclosure statement on client web sites, by the adoption of liberal policies for dealing with customer complaints, including an undertaking not to insist on payment by those line subscribers who contend that they did not purchase the services in question, and by a disclosure statement on its bills.[66] This proposal, however, is not adequate. Improved disclosure on web sites is desirable, but simply does not address the fact that the core of the problem here is that line subscribers often are not the persons who access the web site and therefore will not see even improved disclosure. More liberal complaint policies also are desirable, but they do not deal with the fact that defendants still would take advantage of deception of some consumers, who would not complain even where they would have every right to do so. And defendants' proposed disclosure statement would not go far enough. There is, however, a middle ground between defendants' rather tepid proposals and the Commission.

At oral argument, defendants indicated that they would be prepared to accept a requirement of an explicit disclosure on their bills stating in substance that the line subscriber has no legal obligation to pay the bill unless the line subscriber personally agreed or authorized another to agree to do so.[67] Such a statement, if combined with improved disclosure, with other changes the defendants have proposed, and with a convenient method by which the line subscriber who did not use or authorize use of the services might have the bill withdrawn,[68] would protect consumers adequately during the pendency of the litigation. Accordingly, the FTC's motion for a preliminary injunction barring ANI-based billing is granted to the extent that defendants will be enjoined from engaging in ANI-based billing of any line subscriber unless (a) the line subscriber previously entered into an express verifiable agreement authorizing such billing, or (b) the bill conspicuously contains an express statement that the line subscriber is not obliged to pay the bill unless he or she personally agreed or authorized another to agree to pay for the services for which the bill is rendered and provides a convenient method by which a line subscriber who claims not to have done so may have the bill canceled.[69] The precise details, including the layout and typography of an approved form of bill, will be worked out in the settlement of the preliminary injunction.

## B. Asset Freeze

The Commission seeks, among other things, restitution, refund of monies paid, and disgorgement of gains reaped by defendants through their alleged violations of the Act. Section 13(b) does not explicitly refer to these forms of relief. Nevertheless, courts have held repeatedly that the district court may exercise the full range of equitable remedies as incident to its power to grant injunctive relief sought by

---

66. Defendants have proposed including a disclaimer on the bill indicating that "If someone uses your telephone line to access our service without your authorization, you will not be obligated to pay. If you suspect unauthorized activity contact us by (1) email at <admin@verityinternational.com >, or (2) our customer service toll free line at 1(800) 793–1418. We will then put a block in place so that our service cannot be accessed from your telephone line." Def. Prop. Inj. ¶ 1.a.iii.

67. Tr., Oct. 30, 2000, at 20–21.

68. Defendants might provide a toll-free number which the line subscriber might call and/or a postage paid reply form on which

the line subscriber simply could check a box to have a bill canceled.

69. There is potential for abuse by line subscribers who use the service and then falsely disclaim use to avoid paying for it. The potential, however, is limited by defendants' ability to cut off service to any line subscriber who claims that he or she did not authorize the charges appearing on a bill. Moreover, even had defendants not agreed to the use of this mechanism, the imposition of this risk would have been entirely reasonable, as it is far less onerous than the alternative—a flat prohibition of ANI-based billing absent presubscription agreements.

the FTC under Section 13(b).[70] It is appropriate, therefore, for the Court to consider an asset freeze as "ancillary relief necessary to accomplish complete justice" under this section.[71]

Although the amended complaint is not entirely clear, it does not seem to be limited to the period since Verity started billing line subscribers directly, but to take in its activities in the earlier period during which it billed more than $30 million through AT & T and, briefly, billed through Sprint.[72] Hence, the preliminary injunction seeks a freeze for two reasons—to ensure that the Commission will be able to obtain restitution for prior alleged wrongdoing and to protect customers who may be injured in the future.

Defendants propose to address the Commission's concern by allowing the freeze to remain in effect with respect to sums collected pursuant to the bills Verity, through Integretel, sent out prior to the entry of the temporary restraining order[73] and by posting a $1 million bond. But this would be grossly inadequate. In view of the fact that defendants billed over $30 million through AT & T, about $19 million of which was collected, defendants' exposure here, in the event the Commission prevails, significantly exceeds $1 million in addition to the monies collected pursuant to the September bills. Moreover, as all of the Verity defendants are foreigners, there is a risk that any monetary judgment the Court ultimately might render could prove uncollectible.

Insofar as future billings are concerned, the need for a freeze is modest. If defendants elect to proceed with pre-subscription agreements with line subscribers, there presumably will be no basis for ordering restitution with respect to future collections. Restitution exposure, if any, should be very small even if defendants proceed without pre-subscription agreements because the statement the Court will require on future bills ought to provide adequate protection to most consumers.

Accordingly, the injunction will provide for a freeze of all sums collected pursuant to the September bills and will require either the posting of a bond in an amount (to be determined upon settlement of the order) substantially greater than $1 million or, alternatively, will extend the freeze to all or part of future collections and require repatriation of the assets of the Verity defendants. In any case, defendants will be required to make full and truthful disclosure of their financial conditions.

### Conclusion

The Commission's motion for a preliminary injunction is granted to the extent indicated above. The foregoing constitute the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a). The Commission shall file and serve defendants with its proposed form of preliminary injunction on or before December 18.

**70.** *See, e.g., FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1024–26 (7th Cir. 1988); *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984) (per curiam); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982) ("Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference."); *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir.), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982);

*FTC v. Five–Star Auto Club, Inc.,* 97 F.Supp.2d 502, 533 (S.D.N.Y.2000); *cf. SEC v. Cavanagh,* 155 F.3d 129 (2d Cir.1998) (holding that the district court appropriately granted an asset freeze sought by the SEC).

**71.** *H.N. Singer,* 668 F.2d at 1113.

**72.** Tr., Oct. 4, 2000, at 19–20.

**73.** As of October 2, 2000, the amount frozen was $543,239.03. As Verity billed approximately $30 million through AT & T and more than $10 million for calls made in July and August, the amount presumably now is greater.

Defendants shall file and serve plaintiff with any response on or before December 21 The Court will hear argument on the form of the injunction and any related issues on December 22 at 10:30 a.m. The temporary restraining order will remain in effect until the preliminary·injunction is issued and filed.

SO ORDERED.