FEDERAL TRADE COMMISSION and the People of the State of New York, Plaintiffs,

v.

THE CRESCENT PUBLISHING GROUP, INC., et al., Defendants.

No. 00 Civ. 6315(LAK).

United States District Court, S.D. New York.

Jan. 24, 2001.

Douglas V. Wolfe, Steven M. Wernikoff, Federal Trade Commission, Stephen L. Kline, Assistant Attorney General, Eliot Spitzer, Attorney General of the State of New York, New York City, for Plaintiffs.

Paul R. Grand, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., Sheldon Krantz, Richard J. Oparil, Piper, Marbury, Rudnick & Wolfe, Caroline H. Landau, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendants operate pornography web sites that have offered visitors "free tours" of parts of the contents. In order to take a "free tour," however, a visitor was asked to enter his or her credit card number. The visitor was assured that the card "will not be billed" during the free tour and told that the card number was necessary so that defendants could verify the user's age. Once the visitor entered a valid card number, the visitor was permitted to begin the "free tour." At some point, however, the "free" part of the tour ended and the defendants began billing the visitor's credit card.

The Federal Trade Commission ("FTC" or the "Commission") and New York's Attorney General have brought this action contending, respectively, that defendants violated Section 5(a) of the Federal Trade Commission Act [1] (the "FTCA") and New York law by falsely representing that consumers' credit cards would not be billed, failing to disclose material information,

---

1. 15 U.S.C. § 45(a).

and then charging credit and debit cards without authorization. The matter now is before the Court on the plaintiffs' motion for a preliminary injunction.

### Facts

Defendants Bruce Chew and David Bernstein, together with an allegedly passive investor, Carl Ruderman, and their corporate entities, own and operate "adult content" web sites. The web sites have been registered to corporate defendants The Crescent Publishing Group, Inc. ("Crescent") and Multimedia Forum, Inc. ("Multimedia"). Crescent also provides payroll services, office space and accounting services for the companies while customer service is provided by another affiliate, ICSE, Inc.[2] All or substantially all have used the "free tour" device that is the focus of this action.

### A. The Evolution of the "Free Tour" Web Sites

The practices of these web sites are a moving target. Indeed, versions of the "free tour" web sites from at least three different periods have been presented to the Court.[3] The defendants distinguished pre- and post-November 1999 web pages in their papers[4] and pointed to a new-and-allegedly-improved September 2000 version at oral argument. Defendants suggest, however, that all of the web sites have had the same basic format and have provided the same disclosures to consumers at any one time.[5]

### 1. "Free Tour" Material Before November 1999

The bulk of the 33 consumer declarations submitted to the Court were made in 1999, and many reflect the pre-November 1999 web pages.[6] The stories have much in common. Most consumers reported visiting a sexually oriented Internet web site where they were offered a "free look" at sexually explicit pictures and told that they needed to enter a credit card number to verify that they were over 18.[7] There was nothing subtle about defendants' contention that the credit card information would be used only to confirm age. A typical web page directed visitors to "Prove that you're over 18 and you can try us **FREE**, yes **FREE**. Just enter a valid credit card to show your age and we'll make your hottest dreams cum true—**FREE**—right now."[8] Immediately adjacent to the box where visitors entered their credit card information was the statement that "Your card will NOT BE BILLED."[9]

A visitor who provided a credit or debit card number then could move through pages of pornography by clicking on a "CONTINUE" button on the bottom of each screen. The fifth screen was almost identical in format except that it included, intermeshed with pictures of naked women, the statement that "[y]ou are the king for just a dollar fifty a day billed monthly."[10] The button at the bottom of the page was identical in format, but instead of the word "CONTINUE" it displayed the name of the web page (for example, CLIMAX). If the visitor clicked on the button

**2.** *See* Bernstein Decl. ¶ 8; PX 51(L).

**3.** *See* PX 42(B) (Mar. 16, 1999, <climax-mag.com>); PX 42(C) (Oct. 29, 1999, <climaxmag.com>); DX L(2) ¶ 9 & A (Sept. 20, 2000, <sus.com>); PX 52 (Sept. 25, 2000, <highsocietymag.com>).

**4.** *See, e.g.,* DX L(2), at ¶ 4.

**5.** *See* PX 42(B) & (C).

**6.** *See, e.g.,* PX 1–15, 30, 31 (pre-Nov.1999); PX 16–20 (Nov.-Dec.1999).

**7.** A number of consumers state that they never visited the web site. *See, e.g.,* PX 32.

**8.** PX 42(B). One later web site went so far as to state that "the United States Government requires us to obtain a valid credit card number in order to prove that you are 18." *See* PX 40(N) (<freeskinparty.com> July 28, 2000).

**9.** PX 42(B).

**10.** *Id.*

on the fifth screen (e.g., clicked on CLI-MAX), another screen giving the visitor a user name and password appeared, and defendants then began charging the visitor's credit or debit card a monthly fee. They contend that the "free tour" ended and that the visitor elected to begin paying the fee as a "member" of the web site when the visitor clicked on the button with the web page's name.

In many cases, it was months before consumers noticed a charge on their credit card bill or bank statement that they did not recognize. Going back to earlier statements, several consumers noticed repeated billing of the same amount under different names—all unrelated to the name of the web site. One consumer who had visited <www.highsociety.com> reported repeated debits of $49.99 by Romulust, Archne, and Splitback.[11] Consumers tried to contact the billing company by sending e-mail or telephoning. When they received a form response or no response at all, many eventually canceled their bank cards or reported their credit cards as stolen in an attempt to prevent further charges.

### 2. Subsequent Changes

Defendants, evidently aware of the government's investigation, made changes to their web sites in November 1999. A printout of a revised version submitted to the FTC[12] shows few changes on the first screens. The principal change was on the fifth screen, where a visitor who clicked on the CLIMAX (or other web site name) button not only received a user name and password, but was transferred to another web page containing terms and conditions. The terms and conditions page, with sexu-

ally graphic language generously interspersed, outlined the terms of membership and provided telephone numbers and e-mail addresses for customer service.[13] Again, however, there was no explanation, at least no explicit explanation, that clicking was the equivalent of "joining." Rather, defendants contended at oral argument that consumers should have concluded that they were "making a join decision" from the proximity of the CLIMAX button to price information and to the link to terms and conditions.[14]

In September 2000 defendants made further changes to their web sites. The September version of at least one site[15] added an address to the first screen, relabeled the "continue" button with "continue free look," and changed the button on the "joining" page from a similarly formatted button to one that included the statement "Join DANGEROUS CURVES Now!" Visitors now had the option to "Exit Free Look" by clicking on a different button. In addition to giving the monthly price, the screen broke new ground by explaining that visitors would become members by clicking the button below.

### B. The History of Excessive Charge Backs

Defendants long have been identified by credit card and related companies as having strikingly high levels of "charge backs," which occur when a card issuer credits the card holder and debits the merchant or provider for an amount previously charged to the holder's credit card.

Defendants' experiences with Visa, which at least at one time accounted for more than two-thirds of Crescent's Internet sales charges,[16] are illustrative. When

---

**11.** See PX 2; see also PX 3 (billings labeled aran.com, sxbi.com, and muck-a-muck.com).

**12.** See PX 42(C). The date on the web site is October 29, 1999, but defendants apparently refer to its modifications as those made after November 1999. See Tr., Oct. 16, 2000, at 33.

**13.** See PX 42(D) (flowchart of web pages).

**14.** See Tr., Oct. 16, 2000, at 39.

**15.** See DX A (from the Oct. 16, 2000 hearing).

**16.** See Bernstein Decl. ¶ 17.

a merchant's volume of charge backs exceeds Visa's limit of a 2.5 percent ratio of charge backs to interchange volume or 1 percent of customer dispute charge backs, the Visa Merchant Chargeback Monitoring Program begins to monitor the rates and may eventually charge fines and ultimately terminate services.[17] Visa repeatedly identified Crescent and affiliated companies as having excessive charge backs.[18] In October 1999, it requested that Crescent submit a plan to reduce charge back rates.[19]

Defendants' high level of charge backs caused related problems with Card Service International ("CSI") and Heartland Payment Systems ("HPS"), businesses that help set up merchant accounts. CSI opened several merchant accounts for Crescent and affiliates between late 1996 and mid–1998 and for a few months in 1999, both times eventually closing the accounts because of consistently high charge back rates.[20] Likewise, HPS processed more than $22 million in bank card transactions for eight of the Bernstein–Chew businesses in 1998, but later that year closed all eight of the accounts because of excessive charge backs.[21]

Crescent and affiliates had an average charge back rate of approximately 10.51 percent in 1999.[22] High in itself, this figure does not reflect the full extent of customer dissatisfaction as it does not include the additional 28 percent of sales that the companies credited back to customers during the same period.[23] Moreover, according to Visa, while it may not be unusual for a company to be identified initially because of high charge back rates, the proportion that continues to have excessive charge backs four months later is quite small.[24] Defendants similarly stand out in comparison to the 0.54 percent average charge back level in 1999 that Visa estimates for e-commerce merchants.[25]

In response to the charge back problem, Crescent in March 2000 provided Multicredit and Visa with a $27 million surety bond to guarantee the payment of future charge backs and card holder credits.[26] Crescent arranged also for Northfork Bank to issue a $15 million irrevocable standby letter of credit in favor of Visa International.[27] Nonetheless, as defendants acknowledge, Visa U.S.A., Inc. disqualified some of the corporate defendants from the Visa U.S.A. system in April 2000.[28]

Soon thereafter defendants began processing their credit transactions out of a bank in Guatemala, where they had an account in the name of Luna, S.A. ("Luna").[29] Although Guatemala is outside the jurisdiction of Visa U.S.A.'s Merchant Chargeback Monitoring Program, Visa International did continue to follow defendants' practices. As of September 5, 2000, it permanently disqualified Luna, Cres-

---

17. *See* PX 44, ¶¶ 4–6. Charge backs can occur either because a customer has disputed a charge or for a number of other operational reasons such as charges to an incorrect card number or expired card. *See id.,* ¶ 5.

18. American Express similarly noted a high level of customer inquiries and announced an investigation and possible termination of the relationship in letters sent to Crescent in March and October 1998. *See* PX 42(E).

19. *See* PX 42(E).

20. *See* PX 22, ¶¶ 5, 7, 16.

21. *See* PX 21, ¶¶ 5, 8.

22. *See* PX 44, ¶ 22.

23. *See id.,* ¶ 24. The credits resulted from agreements between the merchant and the customer to credit the customer's account. Because they did not involve the charge back mechanism, they are not included in that percentage.

24. *See id.,* ¶ 7.

25. *See id.,* ¶ 18.

26. *See* DX H.

27. *See* DX I.

28. *See* Ans. ¶ 31; *see also* PX 44, ¶ 27.

29. *See* PX 44, ¶¶ 25, 28.

cent, Chew and Bernstein from participating in any Visa region, blocking the participation of businesses in which Chew and Bernstein "play any role of influence" or businesses owned or managed by either.[30]

### C. Pre–Complaint Investigation and Prior Proceedings

The Commission received approximately 316 complaints against Crescent or its affiliates between August 1998 and July 2000.[31] In February 1999, the FTC notified Chew that the Commission was investigating Crescent and its affiliates.[32] In response, Crescent provided information to the Commission, including an April 1999 letter in which defendants' attorney stated that there had been fewer than ten written complaints about the defendants' programs.[33] Between April 1999 and March 2000, Crescent engaged in similar correspondence with the New York State Attorney General's office, which had received complaints about defendants' <playgirl.com> site.[34]

On August 23, 2000, plaintiffs commenced this action against Crescent, sixty-four related corporations, and individual defendants Chew and Bernstein. The complaint contains five claims for relief, all based on defendants' practices regarding their "free tour" web sites. In the first three counts, the FTC alleges violations of the FTCA. Count One alleges that defendants' representations that they will not bill consumers who visit their "free tour" web sites and that they will use consumers' credit or debit card information solely to verify consumers' age are false and deceptive in violation of Section 5(a).[35] Count Two alleges that the failure clearly

and conspicuously to disclose material information also was false and deceptive in violation of Section 5. In Count Three, the FTC alleges that defendants charge, debit or bill consumers' accounts without authorization and that this is an unfair practice that violates FTCA Sections 5(a) and 5(n).

Counts Four and Five concern the same practices that underlie the first three counts but are grounded in New York law and brought by the New York State Attorney General. Count Four alleges violation of Section 349 of New York General Business Law, which prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of services in New York. Count Five alleges that defendants' practices amount to false advertising in violation of Section 350 of New York General Business Law.

Defendants essentially contend that the representation that consumers' credit cards were not charged during the free tour was true and not deceptive and that the web pages described in plaintiffs' complaint have not existed since November 1999, having been modified repeatedly since then to avoid anything that might be called deceptive.[36] Defendants further claim that the public interest does not outweigh the financial harm that an injunction would cause to the corporate and individual defendants.[37]

Plaintiffs moved for a preliminary injunction on August 23, 2000, and oral argument was held on October 16, 2000. While defendants sought to defend their practices, they have acquiesced in the issuance of preliminary relief, although not in terms as broad as that sought by plaintiffs.[38]

---

**30.** *See* PX 49, 50.

**31.** *See* PX 43, ¶ 8.

**32.** *See* PX 42.

**33.** *See* PX 42(B).

**34.** *See* Krantz Decl. ¶ 20.

**35.** 15 U.S.C. § 45(a).

**36.** *See* Defs. mem. of law in support of defs. opposition to pls. mot. for preliminary injunction, at 1–2.

**37.** *See id.* at 3.

**38.** *See* Tr., Oct. 16, 2000, at 59 ("There is a willingness on the part of the defense . . . to end up with a settlement order that would have in it some form of injunction measure. . . .").

The parties agreed to have the motion decided without an evidentiary hearing.[39]

## Discussion

### A. The Scope of the Remaining 'Dispute

The scope of the dispute has narrowed with the submission by both parties of proposed preliminary injunctions. Plaintiffs ask the Court to enjoin defendants from misrepresenting or failing to disclose material facts and billing consumers without authorization. In addition they request, *inter alia,* an asset freeze, appointment of a receiver, and compulsory repatriation of assets. The Commission would have the Court condition individual defendants' continued operation of any business on the Internet that involves "charging, debiting or billing consumers" on the posting of a $30 million bond.[40]

The defendants in turn have proposed their own form of preliminary injunction.[41] In substantially the same language as the Commission's, the defendants' conduct prohibitions would enjoin defendants from misrepresenting or failing to disclose material facts and from billing consumers without authorization. Slight differences between the parties' conduct prohibitions include divergent definitions of "clear and conspicuous."[42] Defendants propose to post a $5 million bond and to include a clause enjoining them from billing consumers who "subscribed" to defendants' web sites before September 21, 2000 during the pendency of this action. Given these proposals, the remaining areas of significant dispute are the appropriateness and extent of the asset freeze, the amount of the bond, and the appropriateness of receivership.

### B. Supplemental Jurisdiction

■ Under 28 U.S.C. Section 1367(a),[43] the district court has supplemental jurisdiction over claims that "share a 'common nucleus of operative fact' such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.' " [44] The New York Attorney General's state law claims meet both requirements: the FTCA and state law claims derive from the same practices, defendants' operation of their "free tour" web·sites, and one would expect the claims to be tried together because they involve the same evidence and key witnesses. Moreover, the state law is modeled in part on the FTCA and compliance with the FTCA is a defense to charges under the law.[45] Accordingly, the Court may exercise supplemental jurisdic-

**39.** Defendants asserted the need for an evidentiary hearing at the October 16 hearing, *see* Tr., Oct. 16, 2000, at 23, but later changed their position and waived a hearing, *see* Letter from Mr. Oparil to Court, 10/17/00.

**40.** *See* plaintiffs' proposed preliminary injunction ("Pl.Prop.Inj.").

**41.** *See* defendants' proposed preliminary injunction ("Def.Prop.Inj.").

**42.** Defendants' proposal requires that disclosure shall be "reasonably" unavoidable and omits language that sets the consumer's perception and understanding of the disclosure as the standard by which to judge whether consumers are provided with material information.

**43.** *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

**44.** *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704 (2d Cir.2000) (quoting *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

**45.** *See* N.Y. GEN. BUS. LAW §§ 350–c, 350–d (McKinney Supp.2000) ("In any [civil action brought by the Attorney General] it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York.").

tion, including pendant party jurisdiction, over the state law claims brought by the New York Attorney General.[46]

Section 1367(c) enumerates the circumstances in which the district court may decline to exercise supplemental jurisdiction,[47] none of which applies in this case at this stage of the proceedings. The state claims do not raise novel or complex issues of state law or predominate over the FTCA claims over which this Court has original jurisdiction, nor has the Court dismissed the FTCA claims. For the foregoing reasons and because there are no other compelling reasons for declining jurisdiction, the Court exercises its supplemental jurisdiction in this case.

## C. Standard for Preliminary Injunction

### 1. The FTCA Standard

■ The FTCA authorizes the Commission to obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."[48] The standard differs from that applicable to private applicants for such relief. "The intent is to maintain the statutory or 'pub-

lic interest' standard which is now applicable, and not to impose the traditional 'equity' standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner."[49] That is, the FTC does not have to show irreparable harm,[50] but the Court must (1) determine that the FTC has a fair and tenable chance of ultimate success on the merits[51] and (2) consider the equities.[52]

### 2. New York State Law Standard

■ Plaintiffs allege that violation of Sections 349 and 350 triggers the state attorney general's right to seek an injunction under New York Executive Law Section 63(12), which provides, in pertinent part, that "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal

**46.** One purpose of Section 1367 was "to make it clear that in federal-question cases pendent-party jurisdiction is permissible." 13B CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 3567.2, at 55 (Supp.2000).

**47.** 28 U.S.C. § 1367(c). In the Second Circuit, "the discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of subsection 1367(c)." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir.1998).

**48.** 15 U.S.C. § 53(b) (1994 & Supp.).

**49.** H.R. CONF. REP. No. 624, 93d Cong., 1st Sess. 18 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2533.

**50.** *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir.1999).

**51.** *See United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188 (2d Cir.1984); *FTC v.*

*Lancaster Colony Corp.*, 434 F.Supp. 1088, 1090–91 (S.D.N.Y.1977).

**52.** *FTC v. Verity Int'l, Ltd.*, 124 F.Supp.2d 193, 198 (S.D.N.Y.2000). *See Lancaster Colony Corp.*, 434 F.Supp. at 1096 ("The equities to be weighed are not the usual equities of private litigation but public equities." (citing *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir.1976))). There is some disagreement among circuits about the weight to be given private hardship. *Compare Food Town Stores*, 539 F.2d at 1346 (concluding that private equities "are not proper considerations for granting or withholding injunctive relief under § 13(b)"), *with FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir.1991) ("While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight, lest we undermine section 13(b)'s purpose of protecting the 'public-at-large, rather than individual private competitors.' ")).

acts...."[53] For these purposes, fraud has been "interpreted broadly requiring only a showing that the action has a potential to deceive."[54] Section 63(12) requires that actions be repeated either in the sense that there is "repetition of any separate and distinct fraudulent or illegal act," or as "conduct which affects more than one person";[55] defendants' activity qualifies on both definitions.[56]

## D. Injunctive Relief

Even if defendants had not agreed to the conduct provisions, a preliminary injunction would be appropriate. Although the web pages have been modified repeatedly, whether a preliminary injunction is in the public interest does not depend on the continuing existence of every web page; it may be warranted if future violations of law are likely.[57] Although abandonment of allegedly illegal practices bears on whether a court should enjoin defendants,[58] "voluntary cessation of allegedly

illegal conduct does not deprive the tribunal of power to hear and determine the case"[59] and this Court is not "compelled to leave 'the defendant ... free to return to his old ways.'"[60]

### 1. Past Violations

Plaintiffs are likely to show there have been past violations. In fact, in oral argument defendants contested primarily the claim that Crescent-affiliated web sites as they existed *after* November 1999 were deceptive or unfair.[61] Although the elements of each count differ, each turns on how the end of the free tour was signaled. Essentially defendants state that, as promised on the first screen, visitors to their web sites were not billed during the free tour, while the FTC and the Attorney General each contend that the ending of the free tour was imperceptible and thus the visitor was billed for access to content that he or she thought was free.

---

53. N.Y. Exec. Law § 63(12) (McKinney 1993 & Supp.2000). The order may also "direct[ ] restitution and damages ... and the court may award the relief applied for or so much thereof as it may deem proper." *Id.*

54. *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852, 714 N.Y.S.2d 844, 848 (1999) (citing *People v. Apple Health & Sports Clubs*, 206 A.D.2d 266, 267, 613 N.Y.S.2d 868, 869 (1st Dept.1994)), *appeal dismissed*, 84 N.Y.2d 1004, 622 N.Y.S.2d 908, 647 N.E.2d 114 (1994).

55. N.Y. Exec. Law § 63(12) (McKinney 1993 & Supp.2000).

56. Defendants resist the New York application on the ground that the Attorney General did not give them prelitigation notice as allegedly required by state statute. Section 350 of the General Business Law, however, has no notice requirement except in an action for a civil penalty. *See* N.Y. Gen. Bus. Law §§ 350–c, 350–d (McKinney Supp.2000). While Section 349 does require notice, notice is excused when it "is not in the public interest." In any case, defendants acknowledge that they had actual notice of the state's investigation for more than a year before plaintiffs filed the case, notice that has been found sufficient in several New York cases. *See, e.g., People v. Apple Health & Sports Clubs*, 80 N.Y.2d 803,

807, 587 N.Y.S.2d 279, 281, 599 N.E.2d 683 (1992). Accordingly, defendants are unlikely to prevail on their lack of notice defense.

57. *See* 15 U.S.C. § 53(b) (giving the FTC the power to sue to enjoin a practice "[w]henever the Commission·has reason to believe ... that any person, partnership, or corporation is violating, *or is about to violate*, any provision of law enforced by the Federal Trade Commission" and the injunction would be in the public interest (emphasis added)).

58. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982).

59. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

60. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite*, 455 U.S. at 289 & n. 10, 102 S.Ct. 1070) (in turn quoting *W.T. Grant Co.*, 345 U.S. at 632, 73 S.Ct. 894).

61. *See* Tr., Oct. 16, 2000, at 22 ("[T]he government cannot even carry its burden that the material that existed on Crescent-affiliated web sites since November of 1999 is deceptive or unfair.").

### (a) False and Deceptive Representations and Omissions

In the context of the counts alleging false and deceptive representations and omissions, the question is whether defendants misled users of their web sites to believe that they would not be charged for access to content for which defendants ultimately charged them. To establish that defendants violated FTCA Section 5(a) by engaging in deceptive acts or practices in or affecting commerce,[62] the Commission ultimately must demonstrate a material representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances.[63]

Defendants appear to have done their level best, at least prior to September 20, to lead users to believe that their credit cards would not be charged for exploring these web sites. The sites from all the periods touted "free tours." They clearly represented that a user's card would not be billed during the free tour. But they then obscured the point at which the "free tour" ended and thus probably deceived users into going further in the belief that they would not be charged. Although at least some of the web pages mentioned price information—"you are the king for just a dollar fifty a day billed monthly"— the information appeared against a backdrop of sexually explicit images, was relatively inconspicuous, and in any case did not make sufficiently clear that one further step would result in the imposition of charges against the user's credit card.

The materiality of such information cannot be denied. Information concerning prices or charges for goods or services is material, as it is "likely to affect a consumer's choice of or conduct regarding a product."[64] Certainly consumers were likely to decide whether to further explore defendants' web sites on the basis of their understandings as to whether their "free tours" had ended.

Plaintiffs are likely to prevail notwithstanding any contention that users who acted reasonably would have known the point at which further exploration of the web sites required payment of fees. Consumer reliance on express claims such as these is "presumptively reasonable."[65] Moreover, "[i]n evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer."[66]

Precisely the same circumstances make it likely that the Attorney General will prevail on his claims of violations of the relevant provisions of the General Business Law.[67]

---

**62.** 15 U.S.C. § 45(a).

**63.** *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988); *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 526 (S.D.N.Y.2000) (McMahon, J.). The FTC does not have to prove that defendants intended their misrepresentations to defraud or deceive, or made them in bad faith. *See, e.g., World Travel Vacation Brokers*, 861 F.2d at 1029.

**64.** *In re Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F.2d 189 (D.C.Cir. 1986); *Five–Star Auto Club*, 97 F.Supp.2d at 529.

**65.** *See Five–Star Auto Club, Inc.*, 97 F.Supp.2d at 528 (quoting *FTC v. Int'l Computer Concepts, Inc.*, 1994 WL 730144, 1994–2 Trade Cas. (CCH) ¶ 70,798, ¶ 73,402 (N.D.Ohio 1994) (internal quotation marks omitted)).

**66.** *Id.* at 532 (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 872 (2d Cir.1961), *cert. denied*, 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962)); *see also Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir.1993).

**67.** Section 349, which was drafted to parallel FTCA Section 5, *see State v. Colorado State Christian College of Church of Inner Power, Inc.*, 76 Misc.2d 50, 53–54, 346 N.Y.S.2d 482, 486 (1973), prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." In order to prevail under Section 349, the state must demonstrate only that a consumer-oriented act or practice was misleading in a material respect and that an injury to the plaintiff resulted from such act or prac-

*(b) Unfair Practice of Unauthorized Billing of Credit or Debit Cards*

■ The Commission contends that billing consumers' credit or debit cards without authorization is an unfair trade practice, also in violation of Section 5(a) of the Act. An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." [68]

Again defendants rely on the argument that they charged users only after the free tour ended. In the context of the unfair practices claim this amounts to an argument that the billing was with authorization. But that is too facile a response, at least as regards the pre-September 2000 web sites. Absent a clear indication of how users joined the web sites—an indication that did not come until the September 2000 version, if then—plaintiffs are likely to prevail on their claim that the billing was without authorization.

Given the inconspicuous end of the free tour, defendants' contention that their charges were reasonably avoidable because consumers simply could have declined to "join" after their tours had finished seems equally implausible. This conclusion is bolstered by the fact that consumers have had difficulty in avoiding or reversing defendants' bills. Some consumers have been unable to determine who was billing them, what they were being billed for, and how to contest the charges. Defendants' identity was not immediately apparent on the face of the bills because defendants' billed consumers under names that did not resemble the names of the web sites the consumer accessed; defendants themselves acknowledge using various "discreet names for billing descriptors." [69] Several consumers who were able to contact defendants despite these obstacles were denied refunds. In these circumstances, it is likely that the injury to consumers was substantial in the aggregate. [70]

Countering that the benefits of their practices outweigh any harms, defendants point to length of membership and other data as evidence of customer satisfaction. No doubt they have a significant base of satisfied customers. But the material submitted by plaintiffs, supported by the high volume of charge backs and credits, suggests that they also have deceived many others. The benefits do not offset the harm they have done. [71]

---

tice. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24–25, 623 N.Y.S.2d 529, 532–33, 647 N.E.2d 741 (1995); *McGill v. General Motors Corp.*, 231 A.D.2d 449, 647 N.Y.S.2d 209, 210 (1st Dept.1996). There is no requirement of justifiable reliance, *see Oswego Laborers' Local 214*, 85 N.Y.2d at 26, 623 N.Y.S.2d at 533, 647 N.E.2d 741, or of fraudulent intent or recklessness on the part of the defendants, *see Oxman v. Amoroso*, 172 Misc.2d 773, 782–83, 659 N.Y.S.2d 963 (1997).

Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce" or in providing services in New York. An advertisement is false if it is "misleading in a material respect," taking into account "not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations." N.Y. GEN. BUS. LAW § 350–a (1) (McKinney Supp.2000).

**68.** 15 U.S.C. 45(n) (1994 & Supp.).

**69.** *See* Bernstein Decl. ¶ 20.

**70.** *See FTC v. J.K. Publications*, 99 F.Supp.2d 1176, 1201 (C.D.Cal.2000) (citing *American Financial Services Ass'n v. FTC*, 767 F.2d 957, 976 (D.C.Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986)) (small harm to a large class of people amounts to substantial consumer injury under FTCA Section 5); *accord Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989).

**71.** Furthermore, the FTC brought to the Court's attention the fact that web sites registered to defendant Vestals have employed a dialing and billing system that this Court found to be a probable violation of Section 5 of the FTCA. *See FTC v. Verity International, Ltd.*, 124 F.Supp.2d 193 (S.D.N.Y.2000).

### 2. *Continuing and Future Violations*

■ When pressed by the Court, the Commission declined to take a position on whether the September 20, 2000 web site changes the defendants presented violated Section 5. Rather, the Commission stated in oral argument that it would depend on how the new version works when consumers interact with it.[72] Nonetheless, plaintiffs did counter that earlier versions of the web pages continued to exist and provided screen shots and the affidavit of an FTC investigator who had visited one of defendants' web sites on September 25 and 27.[73] The web site shared the flaws of the pre-September 2000 sites: it never explained how users became members and the button that ended the "free tour" and triggered membership was formatted in the same way as previous "continue" buttons. While defendants claimed at oral argument that this version of the web site had been shut down and expressed willingness to freeze the situation while this action is pending,[74] the continuation after September 20 of practices that defendants had represented had been discontinued suggests a more than trivial likelihood of future recurrences.

Quite apart from the recurrence of allegedly discontinued practices, there are additional reasons to conclude that there is a material likelihood of future violations. First, based on the incomplete information now before the Court, it appears that defendants modified their practices only once they knew they were the subject of government attention. Moreover, defendants did not provide the name of Carl Ruderman, Crescent's "investor and economic beneficiary," [75] in either of their voluntary disclosures to the FTC.[76] This late-breaking news that defendants' have a silent partner makes defendants seem less than forthcoming about their funds and corporate structure, as does Mr. Chew's apparent insistence on invoking the Fifth Amendment in discovery in this action absent an iron-clad confidentiality order that would prevent a pending grand jury from gaining access to his testimony here.[77]

It is worth noting also in evaluating the likelihood of future violations that the opening of new merchant accounts coincided with the impending threat of monetary penalties from Visa U.S.A. for excessive charge backs.[78] CSI's director of loss prevention indicated in his affidavit that Bernstein's proposed solution to excessive charge back rates was to add additional small charges that the credit card companies would find cheaper to absorb than to refund using the charge back system.[79] Because Visa uses the total number of transactions rather than the monetary amount to calculate the percentage of charge backs,[80] such a tactic might well reduce the percentage of charge backs.

### 3. *Conclusion*

■ All in all, these defendants give every indication of seeking to profit from disclosing a minimum of accurate information. In all the circumstances, the Court finds that plaintiffs are likely to prevail on the merits of their respective claims and that there is a likelihood that defendants, absent injunctive relief, will violate the relevant statutes in the future. Accordingly, a preliminary injunction is appropriate ab-

---

**72.** *See* Tr., Oct. 16, 2000, at 20–21.

**73.** *See* PX 52.

**74.** *See* Tr., Oct. 16, 2000, at 45.

**75.** *See* PX 51(L).

**76.** *See* PX 42(C), 42(D).

**77.** *See* Order, Jan. 19, 2001.

**78.** *See* PX 22, ¶ 18; PX 44, ¶¶ 14, 26. Defendants acknowledge this pattern, but say they engaged in it on CSI's advice. *See* DX J; Memorandum of law in support of defendants' opposition to plaintiffs' motion for preliminary injunction, at 11–12.

**79.** *See* PX 39, ¶ 8.

**80.** *See* PX 44, ¶ 5.

sent some defense extrinsic to these considerations.

### E. Delay

 The parties quibble over the reasons plaintiffs filed this case more than one year after the FTC's investigation began. Defendants argue that the Commission put the investigation "on hold" to deal with a more urgent matter, while plaintiffs suggest that defendants themselves caused delay by misleading the FTC about the number of complaints they had received. Regardless of whose version most approaches the truth, the defense is unlikely to succeed in its contention because we are dealing with government agencies here. "As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest." [81]

### F. Individual Liability

 Plaintiffs are entitled to relief against the individual defendants, Chew and Bernstein, on a showing that they participated in the corporate defendants' wrongful acts or that they had the authority to control the corporate defendants and knew of the acts or practices.[82] The FTC is likely to succeed in establishing the personal liability of Chew and Bernstein in this case, assuming that it prevails against the corporations. Chew is the president, sole shareholder, and sole director of the corporate defendants, and Bernstein is their secretary and chief financial officer.[83] That is, both are in positions to control the practices of these closely held entities. Not only have both Chew and Bernstein opened merchant accounts for these defendants, but both attended meetings to discuss the possible termination of CSI's services, and there is ample evidence of Bernstein's communications about charge backs and customer disputes.[84] Moreover, Chew has submitted an affidavit in support of an application for a protective order in which he asserts that he will invoke the Fifth Amendment in response to questions in this case absent a court order restricting use of his deposition to this litigation, certainly a fact that the Court is entitled to consider in assessing the likelihood that he is personally responsible for the actions of the corporate defendants.[85] Accordingly, the Court holds that the preliminary injunction should reach Chew and Bernstein as well as the corporate defendants.[86]

### G. Scope of Relief

 As noted above, defendants effectively concede that plaintiffs are entitled to

**81.** *Nevada v. United States*, 463 U.S. 110, 141, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917)). The cases defendants cite in support of this point concern private plaintiffs and irreparable injury, *see Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir.1985), an element the FTC and the Attorney General's office—unlike private plaintiffs—do not have to show.

**82.** *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989); *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 535 (S.D.N.Y.2000).

**83.** *See* Defs. Ans. ¶¶ 17, 18.

**84.** *See, e.g.*, PX 21, ¶ 7; PX 22, ¶¶ 12–13, 15; DX J.

**85.** *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 316–18, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *LiButti v. United States*, 107 F.3d 110, 120–21 (2d Cir.1997); *Brink's Inc. v. City of New York*, 717 F.2d 700, 708–09 (2d Cir. 1983).

**86.** Such relief is equally appropriate under New York law based on the same findings, as corporate officers and directors are liable under Section 63(12) for fraud if "they participate in it or have actual knowledge" of the corporation's fraudulent and illegal conduct. *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807, 587 N.Y.S.2d 279, 282, 599 N.E.2d 683 (1992); *see also People v. Court Reporting Institute, Inc.*, 245 A.D.2d 564, 565, 666 N.Y.S.2d 730, 731–32 (1997).

some injunctive relief, essentially agreeing to the conduct prohibitions plaintiffs request, but they contest the need for an asset freeze and other ancillary relief. Section 13(b) of the FTCA [87] does not explicitly refer to the latter forms of relief. Nevertheless, courts have held repeatedly that district courts may employ the full range of equitable remedies incident to their power to grant injunctive relief sought by the FTC under Section 13(b). [88] The Court therefore may consider these equitable remedies as "ancillary relief necessary to accomplish complete justice" under this section. [89]

■ Plaintiffs seek an asset freeze and repatriation of assets to ensure that both prior and future alleged wrongdoing may be remedied adequately in the event they prevail. With appropriate injunctive provisions, which are not sharply contested, in place pending trial, the likelihood of substantial monetary relief for future violations is small. On the other hand, there is a serious prospect of very substantial monetary relief for defendants' past actions in view of the fact that defendants billed at least $188 million worldwide from 1997 through October 1999, including $141 million in the first ten months of 1999. [90] While these figures do not approximate the likely relief in this case in view of their worldwide scope, the extensive credits and charge backs already made, and the existence of some satisfied customers, the potential monetary relief is large.

The corporate defendants do not appear to be in a position to satisfy claims of the dimension that seem to be at issue here. According to the most recent balance sheet that Crescent has submitted, it had a net worth as at June 30, 2000 of $16.3 million. [91] But that figure vastly overstates its ability to respond to a judgment here. The balance sheet carries as current assets an advance to its beneficial owner, presumably Mr. Ruderman, of $10.8 million and inventories of $18.6 million, but it is questionable whether either could be realized, at least at anything approaching its book value, for the purpose of funding monetary relief in this case.

There is substantial reason also to conclude that defendants, absent relief from the Court, will place additional assets beyond its reach. In 1999, it made stockholder distributions of $15.6 million although its net income was only $12.4 million. [92] Moreover, defendants admittedly already have used a Montserrat bank operating in Guatemala. While this account allegedly was used only as a way station before funds were transferred back to the United States, that situation easily could change.

Defendants nevertheless argue that their prospective liability for monetary relief is secured adequately by the $48,947,000 of collateral that defendants already have provided to cover charge

---

**87.** 15 U.S.C. § 53(b).

**88.** *See, e.g., FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1024–26 (7th Cir. 1988); *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984) (per curiam); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982) ("Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference."); *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir.), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982); *FTC v. Five–Star Auto Club, Inc.,* 97 F.Supp.2d 502, 533 (S.D.N.Y.2000); *cf. SEC v. Cavanagh,* 155 F.3d 129 (2d Cir.1998) (holding that the district court appropriately granted an asset freeze sought by the SEC).

**89.** *H.N. Singer,* 668 F.2d at 1113; *FTC v. Verity Int'l, Ltd.,* 124 F.Supp.2d 193, 206 (S.D.N.Y.2000).

**90.** *See* PX 42(E).

**91.** Bernstein Supp. Decl. Ex. B.

**92.** *Id.* Ex. A., at 3.

backs and credits.[93] This $48 million is made up of a $27 million bond in favor of Multicredit and Visa that expires on March 15,[94] a letter of credit in favor of Visa International under which $12.6 million is currently available,[95] and cash reserves held by various entities totaling $4.347 million.[96] It is not reassuring that defendants double count the $5 million bond in their proposed preliminary injunction, justifying the $5 million with a figure that already includes the same $5 million, but these details pale compared to the fact that, as it now stands, it is not clear how this collateral could be used in the event of a judgment against defendants. Accordingly, action is appropriate to ensure the enforceability of any judgment that may be entered.

The appointment of a receiver is a recognized form of relief in such cases,[97] but is an extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective.[98] In fact, plaintiffs themselves call such relief "Draconian."[99] Particularly on a preliminary injunction motion, when the evidence is incomplete, the Court should not grant relief beyond what is needed. Because less restrictive measures will protect the public interest, no receiver will be appointed at this stage.

To begin with, the preliminary injunction will restrain defendants from distributing or lending, directly or indirectly, any money to their officers, directors and shareholders or entities in which those persons have interests, absent approval of the plaintiffs or of the Court, except for salaries at the rate being paid on the date of this opinion. In this way, such profits as the business may earn will be accumulated during the pendency of the litigation to help create a fund from which the corporate defendants may pay any monetary liability.

Second, the preliminary injunction will require the corporate defendants to transfer all funds now or hereafter held in foreign accounts to accounts in New York branches of a bank or banks organized under U.S. law provided, however, that it shall contain appropriate provision to enable the maintenance of foreign accounts with limited funds if and to the extent that this is demonstrated to be necessary to the efficient operation of the business.

Finally, it will condition defendants' continued operations on the posting of a bond in an amount subsequently to be fixed by the Court after further submissions from the parties.

*Conclusion*

Plaintiffs' motion for a preliminary injunction and other equitable relief is granted to the extent indicated above. The foregoing constitute the Court's findings of

---

**93.** *See* Def. Prop. Inj., at 6.

**94.** *See* DX H. Plaintiffs point out that the posting of this bond apparently resulted in a payment by Multicredit to a Crescent affiliate of a 1 percent transaction fee on all Visa cards or Luna S.A. transactions beginning in mid-March 2000, *see* PX 59(A), but the relevance of this arrangement is not readily apparent.

**95.** *See* DX I. The letter of credit, which Crescent arranged for its United States bank, Northfork Bank, to issue in favor of Visa International, expires on July 13, 2001. *See id.*

**96.** Specifically, the cash reserves consist of $1.6 million held by CSI, $2.3 million held by American Multicredit, $325,000 in an imprest at American Multicredit, and $122,000 held by Amtrade International. *See* Grand Decl. ¶ 7.

**97.** *See, e.g., FTC v. American Nat'l Cellular,* 810 F.2d 1511, 1512–14 (9th Cir.1987); *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1432 (11th Cir.1984) (per curiam); *see also* 12 Charles Alan Wright, Federal Practice and Procedure: Civil § 2983, at 24 (1997 & Supp.2000).

**98.** *Rosen v. Siegel,* 106 F.3d 28, 33–34 (2d Cir.1997); *Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93, 97 (2d Cir.1988); *Ferguson v. Tabah,* 288 F.2d 665, 674 (2d Cir.1961).

**99.** *See* Tr., Oct. 16, 2000, at 19.

fact and conclusions of law pursuant to FED. R. CIV. P. 52(a). Plaintiffs shall file and serve defendants with its proposed form of preliminary injunction and its submissions as to the amount of the bond on or before February 1, 2001. Defendants shall file and serve plaintiff with any response on or before February 8.

SO ORDERED.